Filed 8/17/15

CERTIFIED FOR PARTIAL PUBLICATION*

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re A.C., a Person Coming Under the Juvenile Court Law. | D066943 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. EJ2866) |
| v. | |
| MICHAEL C., | |
| Defendant and Appellant. | |

APPEAL from a judgment and orders of the Superior Court of San Diego County, Gary M. Bubis, Judge. Affirmed.

Joanne D. Willis Newton, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, John E. Philips, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

---

* Pursuant to California Rules of Court, rule 8.1110, this opinion is certified for publication with the exception of part II.

Michael C. (Father) appeals a juvenile court judgment terminating his parental rights to his minor daughter A.C. (the child), and selecting adoption as her permanent plan. (Welf. & Inst. Code, § 366.26; all further statutory references are to this code unless noted.) Father chiefly argues that no sufficient evidence supports the court's underlying findings that (a) the Agency's adoption assessment report (Adoption Assessment) was adequate and up to date on the child's mental and emotional status (§ 366.21, subd. (i)(l)), and (b) there was no applicable exception to adoption preference, i.e., the beneficial parent-child relationship. (§ 366.26, subd. (c)(1)(B)(i); *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576 (*Autumn H.*).)

Father also seeks review, by way of designating his appeal to be a writ proceeding, of certain of the juvenile court's earlier orders from the 12-month review and referral hearing. (Cal. Rules of Court, rule 8.452; all further rule references are to these rules unless noted.) He claims that he did not forfeit such claims, even though his previously appointed appellate attorney declined to file such a writ petition after the 12-month orders were made. Father contends he received ineffective assistance of counsel in that respect, and further, his challenges to the merits of the 12-month referral orders should survive, because the juvenile court had failed to advise him personally of his appeal and writ rights at the close of the 12-month review hearing, but instead, asked counsel to do so. (§ 366.26, subd. (l)(3)(A).)

Accordingly, Father now asks this court to consider whether the 12-month referral hearing orders are still reviewable because they failed to meet the standards of the Indian Child Welfare Act, title 25 United States Code section 1901 et seq. (ICWA), regarding

sufficient evidence (1) of "ICWA detriment" to return the child to his custody, and (2) whether "active reunification efforts" were made that allowed the juvenile court to rule that his reunification services were adequate and could properly be terminated at the 12-month review and referral hearing.

We shall determine that there was no adequate showing in support of Father's claims of ineffective assistance of counsel, and further, he has forfeited the substantive arguments he now raises about the orders made at the 12-month review hearing. Even if we were to consider those claims on a writ basis, we would find them meritless, as we will explain (pt. I, *post*).

Turning to Father's current challenges to the judgment that terminated his parental rights and selected adoption as the permanent plan for the child, we do not find any prejudicial error or abuse of discretion occurred (pt. II, *post*). The judgment is supported by substantial evidence and we affirm. (See fn. 1, *post*.)

FACTUAL AND PROCEDURAL BACKGROUND

In a previous appeal of the juvenile court's jurisdictional orders under section 300, subdivisions (b) and (c), Father challenged the court's findings that active efforts were made to prevent the child's removal from his custody. He also claimed that alternative, less drastic disposition orders should have been made. We found that substantial evidence supported the orders and affirmed. (*In re A.C.* (Aug. 27, 2013, D063632) [nonpub. opn.]; our "prior opinion.")

3

## A. Jurisdiction and Disposition

As set forth in our prior opinion, the child was born in 2005 and was the subject of an earlier dependency proceeding when she was two years old. She was removed from her parents' care after numerous domestic violence reports and incidents. The court ordered reunification services for the family, including a psychological evaluation for the mother,[1] individual counseling for both parents, and other services. Although the parents had not fully complied with their reunification plans, the child was returned to their custody and the first dependency case was closed in September 2008.[2]

Additional reports of the parents' domestic violence and drug use were made to the Agency in 2010 and 2011, resulting in more investigations. In May 2011, Father obtained a restraining order against Mother, who had suffered a psychotic episode.

In November 2011, police were called to the home when Mother threatened to kill Father. She was arrested and incarcerated, and Father obtained a criminal protective order against Mother that precluded her from seeing the child or Father. The expiration date of the protective order was November 2014. The Agency closed the investigation based on the issuance of the protective order and Father's agreement to protect the child from Mother. Additional referrals were made to the Agency in April through October

---

[1] Melody C. (Mother) was diagnosed in 2007 with antisocial, narcissistic personality traits, and possible personality disorder. She was hospitalized again in 2010 related to her drug use and mental illness. She did not appeal the jurisdictional findings or the termination judgment.

[2] Father has prior child dependency history concerning his older children.

4

2012 that the child was displaying inappropriate sexual behavior at school, and she said Father hit her and Mother was at their home with a shotgun.

In November 2012, the Agency filed a petition in the juvenile court under section 300, subdivision (b), alleging that the child was at substantial risk of serious physical harm due to her parents' mental illness, drug abuse and inability to provide care for her. She was taken into protective custody and detained in Polinsky Children's Center (Polinsky). The Agency took this action after learning the child had been absent from school for five days, the parents were using drugs and had been investigated by the police for domestic violence, and Father had made suicide threats. Mother was hospitalized in the county mental health hospital and made accusations about Father sexually molesting the child. Father was apparently not paying attention to the restraining orders he had obtained against Mother.

During the child's intake interview at school in November 2012, she acted inappropriately and gave alarming answers to the social worker's questions. For example, she told the social worker that a demon had made her watch pornographic images on the computer and said that the demon was going to make her kill her parents and herself. She told the interviewer that Father told her not to tell anyone why she had been absent from school, Father had hit her, and Mother was planning to kill herself by jumping off a bridge or stabbing herself.

When the social worker interviewed Father, he gave conflicting statements about the child's absence from school, and what he, Mother and the child had been doing.

5

Father declined to drug test. At some point, Father had obtained dismissal of one or more of the protective orders preventing Mother from contacting him or the child.

The child was detained in out-of-home care pending the next hearing and a psychological evaluation was ordered. Father was granted liberal, supervised visits and Mother was to have reasonable, supervised visits. A court appointed special advocate (CASA) volunteer was appointed in November 2012. The court found that ICWA applied and ordered the Agency to provide notice to Father's tribe, the Chickasaw Nation (the tribe), which was permitted to intervene. The tribe's representative, Regena Frye, provided a declaration stating that the child was a member (7/256 Indian heritage), as was Father, and the tribe agreed with her out-of-home placement.

The December 2012 report of the child's psychologist's evaluation included accounts of her erratic behavior and statements ("I'm a werewolf" or vampire) that the evaluator observed and that were described by others. The child had been diagnosed with hyperactivity (ADHD) and was taking medication for it, and more serious mental illness was a possibility. In January 2013, the Agency amended the petition to add an allegation under section 300, subdivision (c) (child at substantial risk of serious emotional damage for lack of appropriate parental care and needed mental health treatment).

At the contested jurisdictional hearing in March 2013, Father testified that the child had been in therapy since she was three years old, to address Mother's absence from her life. Father agreed that he should not allow Mother to see the child until a court determined that Mother could do so. Testimony from the Agency's social worker, the ICWA tribal representative Frye, and the evaluating psychologist was taken. The court

made findings declaring the child to be a dependent child, removing her from Father's care, placing her in foster care and finding detriment to place her with Mother. In August 2013, the court found beyond a reasonable doubt that, based on Frye's declaration and trial testimony, continued care of the child by her parents was likely to result in serious emotional or physical damage and that there was good cause to depart from the placement preferences set forth in the ICWA. The court also found by clear and convincing evidence that active efforts had been made to provide remedial services and rehabilitative programs to prevent the breakup of an Indian family, but that those efforts had thus far been unsuccessful. The court ordered reunification services for the parents, noting: "He loves his daughter, I have no doubt about that. I think that his emotions have caused him to make bad choices with regard to his daughter. That is where the reunification services have to come in. He is going to have to do things that he doesn't emotionally agree with to protect his daughter. . . . It is not that I don't believe him, I need some history. . . . I think if you wholeheartedly engage in these reunification services there is no reason this shouldn't be a case that results in some early type of reunification." The court's minute order stated it was possible that the child could be returned home by the next hearing.

Our prior opinion found no error in the jurisdictional orders. We rejected Father's challenges to the sufficiency of the evidence to support the court's dispositional order (mainly, whether there were reasonable alternatives to removal). We noted that the child had been exposed to domestic violence between her parents, and the evidence was

7

sufficient to support the court's finding that there were no reasonable means to protect her without removing her from Father's custody.

Our prior opinion next rejected Father's second assertion, which claimed there was no substantial evidence in support of the court's finding that the Agency had made "active efforts" to prevent the breakup of his Indian family. (See Pt. I.C.2, *post,* on similar issue.)

### B. Six-Month Review Hearing

In June 2013, the child had been placed with an nonrelative extended family member (NREFM), who is a Native American (the caregiver) and who lives in Oceanside. The child was doing well and enjoyed visiting with Father, who lived in Clairemont. He was in individual counseling (with Dr. Matthews), working on his issues of impulse control, bad judgment, and anger management. He was learning to accept responsibility for setting poor boundaries and enabling Mother, and for putting the child in danger.

The tribe offered the child and her caregiver services, and notified the Agency that in its view, the Agency was fulfilling ICWA requirements by placing her in a Native American home.

Through August 2013, Father had unsupervised visits with the child. In September 2013, the child told the caregiver that Father took her to his house during a weekend visit, when Mother was there, but he told her not to tell anyone. The child was having meltdowns at school and her teacher thought she was under stress, possibly because Father was telling her too much about his problems. Dr. Matthews saw Father

8

briefly in mid-October, when he made a scene at her office, while acting tired and more unstable than before. She said she would not see him again until he had a psychological evaluation.

At the six-month review hearing in October 2013, the court found the Agency had made active efforts, as defined in ICWA, to prevent the breakup of the Indian family, but those efforts had not been successful. The court continued Father's reunification services. He agreed to have a psychological evaluation, which was conducted in December 2013. The examiner, Dr. O'Meara, agreed Father loved the child, but questioned whether Father's fair to poor judgment and minimal motivation to participate in services would hinder successful reunification. Dr. O'Meara believed that Father would require six to nine more months of therapy for anxiety and depression, to improve his functioning.

Beginning in November 2013, Father notified the social worker that he did not want to carry out visitation with the child at the place that the Agency had arranged, the North Central Visitation Center. He felt that the child should not be exposed to the center's environment, or to that of a facility like Polinsky. Father had one visit with the child on December 15, which his sister supervised. He lived with his sister off and on.

On January 13, 2014, the caregiver returned a call from Father, but when Mother answered the telephone, the caregiver hung up. When Father spoke to the social worker on January 16, 2014, he told her that it was very difficult for him to visit because of distance, transportation, and his work schedule. The social worker offered him visits at another facility (Levant), or recommended that he go to Oceanside where the child was

9

placed. He missed several visits during the period between February and April 2014, which upset the child.

### C. Termination of Reunification Services at 12-month Review and Referral Hearing; Writ Request and Appellate Dismissal

The 12-month review hearing had been set in August 2013 but was continued until April 2014. In the status review report of November 7, 2013, the Agency recommended terminating reunification services. The social worker, Ms. Keeling, described the difficulties that the Agency had in arranging Father's visitation with the child, once supervised visitation was required as of October 2013. He did not want to have the child go to visitation centers. The Agency gave him bus passes but it had canceled about five visits.

While the 12-month review hearing was still pending in January 2014, Father brought a motion requesting that these proceedings be transferred to tribal court. However, the tribe declined to accept the transfer and Father's motion was denied on March 19.

At the April 2014 hearing, the court received Agency addendum reports dated December 17, 2013 and January 22 and April 11, 2014, as well as previous reports and the CASA's report dated November 7, 2013. Although the court had a telephone call made to the tribe's representative, there was no answer, and the court stated there was not much more the court could do about that. Father testified he visited the child regularly at the Levant facility, on Tuesdays, and he telephoned her almost every day. He said he took parenting classes on his own initiative and would do so again, but the Agency had

10

only offered him therapy. Father testified that he understood the child could not have contact with Mother, as it was bad for the child's mental health.

At the end of the 12-month hearing, the court made findings by clear and convincing evidence that the Agency had made active efforts to provide Father with remedial services and rehabilitative programs, reasonably designed to prevent the breakup of the Indian family. However, Father did not make substantive progress with the provisions of his case plan, the services were not successful, and they were terminated. The court found "beyond a reasonable doubt" that it would create a substantial risk of detriment to the child's physical and emotional well-being to return her to Father's custody. Placement was continued with the caregiver. The court referred the matter to a section 366.26 selection and implementation hearing.

At the close of the hearing, the court requested that Father's counsel advise him of his writ rights to challenge the findings. Father, through his attorney of record at the time (Dependency Legal Group, Conflict Parent Office), filed a notice of intent to file a writ petition on April 17, 2014.

The case was transferred to the Dependency Legal Group's writ and research office, as shown by an association of counsel for the writ proceeding, filed on May 14. Attorney Amanda Gonzales of that office subsequently served a letter on all parties notifying them that she had reviewed the record and transcript of these proceedings and consulted with trial counsel, had not found any arguably meritorious issues, and thus she would not be filing a writ petition on Father's behalf. She mailed Father a blank form

11

with instructions, Petition for Extraordinary Writ (JV-825), so he could proceed in propria persona if desired. The record does not indicate that he did so.

This Court dismissed the notice of intent to file a writ petition, based on counsel's representations, on May 23, 2014. (*Michael C. v. Superior Court* (D065793).)

### D. Termination of Parental Rights and Permanency Planning Hearing

For the section 366.26 hearing held on October 22, 2014, the court received, without objection, the Agency's Adoption Assessment dated August 7, 2014 (§ 366.21, subd. (i)(l).) The Adoption Assessment was prepared by social worker Sarah Ulrich, who recommended the court terminate parental rights and order adoption as the permanent plan. She learned from tribal representative Andrea Richards that the tribe was in support of termination of parental rights and adoption by the current caregiver, who had an ICWA approved home.

The social worker reviewed the files which showed the child continued to have difficulties with impulsivity and the caregiver and psychiatrist were trying to stabilize her ADHD medication. Her medical condition was being monitored weekly, due to changes in her medication regime. The child told the authoring social worker that she wanted to remain in the caregiver's home, calling her "Mom." After some preliminary adjustment difficulties, the child had developed close relationships with other foster children who had come to the caregiver's home. The Agency referred the family to a special treatment program.

The Adoption Assessment found the child was adoptable due to her good health, sociability, personality, and on target developmental characteristics. She wanted to be

12

adopted, and her caregiver was willing to participate in the home study process. Other such approved adoptive families in San Diego were known to be willing to adopt a child with like characteristics. The Adoption Assessment concluded that it would not be detrimental to terminate parental rights.

The court also received into evidence a CASA report dated August 7, 2014, stating that the child (almost 9 years old at the time) had expressed a preference to her for remaining with her caregiver, rather than returning home to Father. The CASA believed that the Agency had continued to provide transportation tokens to Father, but he nevertheless did not visit the child where she lived. Overall, the child had made marked improvements in her behavior and demeanor since the time the CASA worker met her at Polinsky (around Nov. 2012). According to the CASA, the child had received consistent parenting from her caregiver. The court also received the October 22 declaration of the tribe's ICWA social worker, Andrea Richards, supporting the current plan.

An October 22, 2014 addendum report described an October 2 voicemail that Father left for the social worker, which was the second time he had contacted her since she received this case on May 16. When she reached him on October 7, Father said he was homeless and asked about visitation. She told him she would set up visitation, but when she attempted to telephone him about the arrangements, she got a message for the second time that his voicemail box was not set up.

At the permanency planning hearing, the court noted that substantial compliance with notice requirements to Mother had been made, and she had not appeared in the proceedings since 2013. The court heard Richards' telephonic testimony about her

13

background and review of the child's records. Father testified that he spoke to the child every day on the phone, and said that he had been able to manage her ADHD medication when he was in charge, and he did not believe that the Agency and the caregiver were able to do so properly. He was not sure whether the Agency had tried to give him bus tokens, and he was not sure how to get to Oceanside.

The court ruled that by clear and convincing evidence, the Agency showed it had made active efforts to provide Father with those remedial services and rehabilitative programs designed to prevent breakup of an Indian family, but such efforts were unsuccessful. Based on the testimony and declaration of Richards and other evidence, the court found beyond a reasonable doubt that it would be detrimental to award custody of the child to Father, as it would likely result in serious emotional or physical damage to her. The court further found it was likely that the child would be adopted if all parental rights were terminated.

In addition, the court ruled that the exception found in section 366.26, subdivision (c)(1)(B)(i) (beneficial parental relationship) did not apply to Father, and all parental rights were terminated. Adoption was found to be in the child's best interests, and the permanent plan of adoption was deemed to be appropriate and preferred. The child was referred to the Agency for adoptive placement by the caregiver as the prospective adoptive parent. Father appeals.

## DISCUSSION

Before we reach the merits of Father's challenges to the judgment terminating parental rights and ordering adoption as the child's permanent plan, we address the

validity of Father's contentions that the juvenile court wrongfully terminated his reunification services at the 12-month review hearing, and acted without sufficient evidentiary support. This will require consideration of Father's claims that he received ineffective assistance of counsel (IAC) in that respect, and further, that these reunification issues are now reviewable because the juvenile court failed to advise him personally of his appeal and writ rights, at the close of the 12-month review hearing. (§ 366.26, subd. (l)(3)(A).) We will also address his claims of prejudice, assuming any error were found. (Pt. I, *post*.)

We then turn to his substantive challenges to the judgment that terminated his parental rights and selected adoption as the child's permanent plan. (Pt. II, *post*.)

I

*12-MONTH REVIEW HEARING ORDERS*

A. Introduction; Substantive Claims

After Father filed his request for review of the 12-month review hearing orders that terminated his reunification services, his appointed attorney reviewed the file but found no meritorious issues. She notified this court that no writ petition would be filed pursuant to rule 8.452 (writ petition for order setting hearing under § 366.26) and *Glenn C. v. Superior Court* (2000) 78 Cal.App.4th 570, 580 (attorney need not file a writ petition where no arguably meritorious issues found). The notice of intent to file a petition was dismissed by this court on May 23, 2014.

As a substitute or renewal of that avenue of review, Father contends that we should treat his appeal as a writ petition and examine the merits of the decision to

15

terminate his reunification services and set a permanency planning hearing. (§ 366.26.) Father contends he retains a right to review under section 224, subdivision (e): "Any Indian child, the Indian child's tribe, or the parent . . . from whose custody the child has been removed, may petition the court to invalidate an action in an Indian child custody proceeding for foster care or guardianship placement or termination of parental rights if the action violated Sections 1911, 1912, and 1913 of [ICWA]." Likewise, Father invokes an ICWA enforcement provision, title 25 United States Code section 1914, providing, "Any Indian child who is the subject of any action for foster care placement or termination of parental rights under State law, any parent or Indian custodian from whose custody such child was removed, and the Indian child's tribe may petition any court of competent jurisdiction to invalidate such action upon a showing that such action violated any provision of [sections 1911, 1912, and 1913 of ICWA]."

As the first claimed violation of the evidentiary standards of ICWA, Father cites to title 25 United States Code section 1912(e), providing standards for placement in foster care, requiring "clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Father claims this "ICWA detriment" finding was not made with enough expert evidence support. (§ 224.6, subd. (b)(1).)

As the second claimed violation of ICWA, Father cites to title 25 United States Code section 1912(d), arguing the reunification efforts made were insufficient to meet this higher "active efforts" standard of ICWA, over and above the usual "reasonable

16

efforts" standard of section 366.21, subdivision (e).[3]  (*In re K.B.* (2009) 173 Cal.App.4th 1275, 1287.)

    B.  Cognizability of Current Request for Treatment as Writ Proceeding; Forfeiture

        Before discussing any details of the claimed shortcomings of the 12-month review hearing orders under the evidentiary standards of ICWA, we examine the bases for Father's claim that he has not forfeited such claims at this stage of the process.  "The forfeiture doctrine has been applied in dependency proceedings in a wide variety of contexts, including cases involving failures to obtain various statutorily required reports [citation]; failure to object to the adequacy of an adoption assessment [citations]; failure to request an alternative placement [citation]; and failure to require expert testimony and to make the required findings using the beyond-a-reasonable-doubt standard as mandated by ICWA [citation]."  (*In re G.C., Jr.* (2013) 216 Cal.App.4th 1391, 1398-1399; but see *Jennifer T. v. Superior Court* (2007) 159 Cal.App.4th 254 [purported appeal of order terminating reunification services and setting permanency plan hearing treated as petition for writ of mandate].)

        If the courts nevertheless consider an argument that could have been deemed forfeited, a harmless error standard will apply if the claimed violation was not one involving the fundamental jurisdiction of the court to act, but was statutory in nature.  (*In*

---

3    ICWA, title 25 United States Code section 1912(d) provides, "[a]ny  party seeking to effect a foster care placement of, or termination of parental rights to, an Indian child under State law shall satisfy the court that active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."

17

*re Riva M.* (1991) 235 Cal.App.3d 403, 412; see *In re S.B.* (2005) 130 Cal.App.4th 1148, 1162 ["any failure to comply with a higher state standard, above and beyond what the ICWA itself requires, must be held harmless unless the appellant can show a reasonable probability that he or she would have enjoyed a more favorable result in the absence of the error."].)

To attack the referral orders, Father first complains that the juvenile court mistakenly asked his trial counsel to notify Father of his appellate petitioning rights, rather than doing so directly. (§ 366.26, subd. (l)(3)(A) [oral advisement by court of writ review requirements; as implemented by rules 5.708(n) and 5.590(b)].) Under any standard of prejudice, we reject this particular claim, since not only did Father's trial counsel file a notice of intent to file a petition on his behalf, but his subsequently appointed appellate counsel timely responded (albeit not in the way that Father wanted her to), and she also sent Father the appropriate paperwork so he could proceed in pro per, if he wanted to do so. Father was familiar with dependency procedures concerning his older children and from the child's previous dependency case. There was substantial compliance in making the statutory advisement required in section 366.26, subdivision (l)(3)(A).

Father next argues that his appointed appellate counsel's activities in reviewing the file, but deciding not to pursue a writ petition, amounted to ineffective representation that fell below an objective standard of reasonableness. (*People v. Weaver* (2001) 26 Cal.4th 876, 925.) Further, he attempts to show there was a reasonable probability that absent counsel's deficiencies, the result would have been different. (*Ibid.*) In that light, we

18

could conclude that Father, through counsel, was afforded an adequate opportunity to obtain review of the 12-month referral orders, even though he disagrees with the result. However, giving due weight to his contentions that he received only ineffective assistance, we look to the merits of the claimed errors.

## C. Nature of Claims; Harmless Error

### 1. ICWA Detriment

Father claims the "ICWA detriment" finding at the 12-month review hearing was made without required expert evidence support. (§ 224.6, subd. (b)(1).) Father cites to title 25 United States Code section 1912(e), providing standards for placement in foster care, requiring "clear and convincing evidence, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." Section 361.7 contains similar detriment language and evidentiary requirements.

In the reply brief, Father cites to the Bureau of Indian Affairs, Guidelines for State Courts and Agencies in Indian Child Custody Proceedings, 80 Federal Register 10146-10159 (Feb. 25, 2015) (BIA Guidelines) now providing that "these guidelines should be applied in all proceedings and stages of a proceeding in which the Act is or becomes applicable." (*Id.* at 10150, § A.1.)

Several amendments to section 224 et seq. were enacted in 2006, in an effort to bring California dependency law into line with ICWA standards. (Stats. 2006, ch. 838, § 1, p. 6536; *In re W.B., Jr.* (2012) 55 Cal.4th 30, 52.) Pursuant to section 224.6, subdivision (b), a juvenile court considering whether to involuntarily place an Indian

19

child in foster care or terminate the parental rights of a parent of such a child, shall "(1) Require that a qualified expert witness testify regarding whether continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." (§ 224.6; see § 361.7, subd. (c) [expert testimony required on detriment to return child to Indian parental custody].) Instead of live testimony, a declaration or affidavit from a qualified expert may be accepted upon an adequate written stipulation. (§ 224.6, subd. (e).)

As of the March 2013 dispositional hearing, the tribe's representative agreed that removal from Father's custody was then in the child's best interests. Since June 2013, the child had been placed with the current caregiver, in an ICWA approved home, with the approval of the tribe. The Agency thus showed its support for efforts to retain the child's tribal ties and cultural heritage. (See *In re Desiree F.* (2000) 83 Cal.App.4th 460, 469.) As of January 2014, when Father's motion requested that the proceedings be transferred to tribal court, the tribe declined to accept the transfer.

In March 2014, the tribe's ICWA social worker Richards was assigned to the case, and the recommendations did not change. At the April 2014 review hearing, the court noted that an attempt had been made to obtain information from the tribal representative by telephone, but only a recording responded and there was not much else the court could do at that point. The court stated that there had been delay in getting to the 12-month review hearing because the request to transfer to tribal court had to be resolved, and it was denied in March 2014.

In *In re K.B., supra*, 173 Cal.App.4th 1275, 1285, footnote 11, it was found not significant that a dispositional order was made without the benefit of testimony " 'of a qualified expert witness, as defined in Section 224.6, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child,' as required by section 361.7, subdivision (c)."  In that case, since there was expert opinion evidence at the section 366.26 hearing that return of custody to the parents would cause danger of serious harm to the children, and since the dispositional order had been supported by a finding of "substantial risk" to the children from return to parental custody, the appellate court said, "If the expert witness had testified at the disposition hearing, there is no reason to suppose that the court would have made a different finding."  (*In re K.B., supra*, at p. 1285, fn. 11.)  The court's dispositional order for further services to the mother was in accordance with the goals of ICWA, and no error from the lack of expert testimony at that stage had occurred.  (*Id*. at p. 1285.)

Here too, even without expert witness testimony at the 12-month review hearing on an ICWA detriment finding, the record was adequate to support an implied finding of detriment to return, under any standard.  (§ 224.6, subd. (b); *In re Riva M*., *supra*, 235 Cal.App.3d 403, 413.)  There was a declaration about detriment to return custody from an ICWA tribal representative in the file, and there were no indications in the reports or other testimony of any changes to the status quo since the dispositional stage.  No discernible prejudice to Father occurred from the unavailability of live expert testimony at the 12-month hearing.

21

## 2. *Sufficiency of "Active Reunification Efforts"*

As the second claimed violation of ICWA at the 12-month review hearing, Father contends that the finding that "active reunification services" had been provided was defective under current ICWA standards. He cites to title 25 United States Code section 1912(d), in support of his argument that the reunification efforts made failed to meet the higher "active efforts" standard of ICWA, compared to the "reasonable efforts" standard of section 366.21, subdivision (e). (*In re K.B.*, *supra*, 173 Cal.App.4th 1275, 1287.) In the reply brief, Father cites to the summary of the new BIA Guidelines, set out in the notice accompanying them, as stating: "The phrase 'active efforts' has been inconsistently interpreted. The guidelines' definition is intended to provide clarity — particularly in establishing that 'active efforts' require a level of effort beyond 'reasonable efforts.'" (BIA Guidelines, *supra,* 80 Fed.Reg. 10147, Pt. III.) Current section 361.7, subdivision (b) explains that active efforts "shall be assessed on a case-by-case basis. The active efforts shall be made in a manner that takes into account the prevailing social and cultural values, conditions, and way of life of the Indian child's tribe." (§ 361.7, subd. (b).) Services must include the use of available resources of the extended family, the tribe, Indian social services agencies and Indian caregivers. (*Ibid.*)

In a footnote in our prior opinion, we declined to address whether "the 'active efforts' requirement found in the [ICWA] and related state law is equivalent to the 'reasonable efforts' requirement applicable in non-ICWA juvenile dependency proceedings." We said, "Even if there is a difference between the two standards, we conclude that the evidence presented in this case constitutes substantial evidence under

22

both." (See *In re Michael G.*, *supra*, 63 Cal.App.4th at pp. 712, 715-716 [substantial evidence standard used on appeal to evaluate the court's findings of active efforts].)

Father now seems to argue that during the postjurisdictional phase of the proceedings, the Agency continued to fail to provide active reunification efforts directed toward him, or toward Mother. The Agency had essentially lost contact with Mother after the initial investigation for the jurisdictional hearing. Mother was hospitalized at times for her mental illness, and by 2014, her attorney was relieved from representing her because of lost contact. Taken together, Father argues that these facts about the family showed he was struggling with anxiety and depression and was having difficulty in carrying out visitation between San Diego and Oceanside, and thus the situation required greater efforts and outreach by the Agency.

Even in light of the new guidelines information, the general principle still applies, that "[t]he adequacy of reunification plans and the reasonableness of [the Agency's] efforts are judged according to the circumstances of each case." (*Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1345.) The Agency "must make a good faith effort to develop and implement a family reunification plan. [Citation.] '[T]he record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . .' " (*Ibid.*)

After taking jurisdiction, the Agency continued to do more than merely offer a paper plan to Father and wait for him to do something. It encouraged Father to continue

23

to see a therapist at the Indian Health Center, and offered drug testing and referrals to counseling, substance abuse treatment, parenting classes and domestic violence services. The Agency attempted to accommodate Father's preferences for where the visitation with the child should take place, although there were logistical difficulties on both sides. The Agency offered Father transportation tokens to Oceanside, but he still did not participate in visits.

When tribal representative Richards was appointed to the case in March 2014, the file indicated that ICWA requirements were being met through the placement in the caregiver's home. The tribe consistently gave the court its opinion that continued custody by Father was likely to result in serious emotional or physical damage to the child, and termination of both parents' rights was recommended, with adoption as the child's permanent plan. By October 2014, the tribe acknowledged that active reunification efforts were made but were not successful. Thus, the court had an adequate basis to conclude that active efforts, within the meaning of ICWA, had been made to attempt to prevent the breakup of the parental relationship.

Even under a heightened standard for active reunification efforts, the evidence presented substantially supported the court's 12-month review ruling terminating services. Under all the circumstances, Father cannot demonstrate material deficiencies in the reunification efforts directed toward him, or to Mother, nor that there was any undue prejudice resulting from the Agency's actions. We therefore need not make a determination on whether appellate counsel's performance was deficient in declining to

24

file a writ to challenge the reunification efforts, after the 12-month referral hearing. (*People v. Sapp* (2003) 31 Cal.4th 240, 263.)

II

*ISSUES ON TERMINATION OF PARENTAL RIGHTS AND*
*PERMANENT PLAN OF ADOPTION*

Father's substantive challenges to the judgment of termination of his parental rights are first based on a claim that the Agency's Adoption Assessment was inadequate, because it did not sufficiently discuss the child's current mental and emotional status. (§ 366.21, subd. (i)(l).)  He also argues that the court erred in finding that no exception to adoption preference applied, i.e., the beneficial parent-child relationship.  (§ 366.26, subd. (c)(1)(B)(i).)  We discuss these two claims separately.

First, however, we note that to the extent Father now relies on due process deprivation arguments, to argue that insufficient evidence supports the judgment terminating his parental rights because of error in terminating his reunification services at the 12-month review hearing, the same reasoning expressed above on the ICWA issues should apply.  Father has not shown any due process entitlement arising from the defects complained of (e.g., IAC), to reopen the issues about any missing "active efforts" to reunify, or any lack of essential expert testimony, or any inadequate advisement of appeal rights by the court.  (See *In re Arturo A.* (1992) 8 Cal.App.4th 229, 238 [due process right to competent counsel arises at permanency or referral hearing]; *In re Emilye A.* (1992) 9 Cal.App.4th 1695, 1710-1711 [due process right to counsel exists at jurisdictional hearing].)  Without a more convincing showing how or why due process standards were

25

not met, and to Father's prejudice, we are required and authorized to examine the termination judgment for any substantial support in the evidence.

## A. Adoption Assessment Report

Father argues the Adoption Assessment was deficient, since the child admittedly has significant emotional and behavioral problems, and she remains in ongoing treatment. He claims the Adoption Assessment did not include sufficiently up-to-date information to support the adoptability finding. (*In re John F.* (1994) 27 Cal.App.4th 1365, 1378.) After terminating reunification services at the 12-month review hearing, the court had ordered that the therapist provide progress reports to the social worker. However, no new psychological evaluation of the child (since Dec. 2012), or any recent reports from her treating psychiatrist or psychologist, were attached to the Adoption Assessment.

At the October 22, 2014 permanency planning hearing, the court received into evidence without objection the Adoption Assessment dated August 7, 2014. (§§ 366.26, 366.21, subd. (i)(l).) Father did not challenge the adequacy of the Adoption Assessment at that time. He did not seek to cross-examine the authoring social worker, or ask that her report be refreshed. No one called the caregiver to testify about her knowledge of the child's status or her own plans to adopt. Father's newly raised claim on appeal of the report's inadequacy may thus be deemed forfeited. (*In re G.C., Jr., supra*, 216 Cal.App.4th 1391, 1398-1399; *In re Crystal J.* (1993) 12 Cal.App.4th 407, 411-412; *In re Dennis H.* (2001) 88 Cal.App.4th 94, 98 [appellate court ordinarily does not consider procedural defects where an objection could have been but was not raised below].)

26

Even assuming forfeiture of this substantive argument that the Adoption Assessment should have been more extensive, we exercise our discretion to examine the record and evaluate the claims. We look to whether clear and convincing evidence supported the finding that the child is likely to be adopted within a reasonable time. (*In re Brian P.* (2002) 99 Cal.App.4th 616, 623-624; *In re K.B., supra*, 173 Cal.App.4th at p. 1292.) Under section 366.21, subdivision (i)(l)(C), the Adoption Assessment was required to include "an evaluation of the child's medical, developmental, scholastic, mental, and emotional status," for purposes of evaluating whether the child is likely to be adopted. (*In re Brian P., supra*, at p. 624.) More than an unsupported opinion from a social worker is required to support a finding of adoptability. (*Ibid.*)

Where an adoption assessment report, viewed in light of the totality of the evidence before the court, omits to examine significant factors necessary to make an adoptability finding, it may be deemed so deficient as to impair the basis of the judgment terminating parental rights. (*In re Valerie W.* (2008) 162 Cal.App.4th 1, 15.) However, substantial compliance with statutory requirements may be found if the record as a whole provides the juvenile court with sufficient factual information to determine whether adoption is feasible and in the child's best interests. (*In re John F., supra,* 27 Cal.App.4th 1365, 1378.)

Overall, the Adoption Assessment described the child as adoptable (in good health, sociable, interesting personality, and on track development). She wanted to be adopted, and her caregiver had begun the home study process. The caregiver had been dealing with the child's mental health and educational issues since June 2013 and was

27

working with the psychiatrist to try to stabilize the child's medication, due to continuing concerns about her impulsivity and hyperactivity. The child had some adjustment difficulties with other foster children who had come to the caregiver's home. The Agency had referred the family to a special treatment program. The child was participating in exercise activities and was a member of a club on the Rincon reservation, where Native American children learn more about their culture.

The Adoption Assessment stated that the child's medical condition was being monitored weekly, due to changes in her ADHD medication needs and responses. The social worker anticipated that the child would continue to see a therapist and a psychiatrist at Rady's outpatient clinic (Children's Hospital), and she would likely be able to transition to a long-term "TERM" program therapist and a private practice psychiatrist, once her medication was stabilized. The Adoption Assessment acknowledged that the child sometimes made bizarre statements (e.g., she liked dead animals), and the caregiver was able to respond by turning them into positive ideas (becoming an archaeologist). The social worker believed that the caregiver's efforts with the child, in teaching her appropriateness of her behavior and statements, were helping her to "become a productive happy young girl."

The CASA volunteer noted in November 2013 and August 2014 that there had been significant improvements in the child's condition since November 2012. The Agency's addendum report dated October 22, 2014 gave details of ongoing problems that Father had with visitation, while stating that the child had been assessed as adoptable and giving no indication of any changes in that respect.

28

Even assuming that the child may continue to face mental health challenges, Father has not shown why her problems were of such a nature that adoption was not likely to occur, either by the caregiver or another approved adoptive family. The juvenile court specifically stated that the child's behavior and ADHD did not "render her unadoptable," and noted that the caregiver had shown dedication in addressing any issues which surfaced. This Adoption Assessment gave enough of a current picture of the child's needs and status to be deemed to substantially comply with the standards of section 366.21, subdivision (i)(l). The adoptability finding is sufficiently supported by the record.

### B. Beneficial Parental Relationship

#### 1. *Applicable Standards; First and Second Prong*

Although the court found the child was likely to be adopted, Father contends the beneficial parental relationship exception to termination of parental rights should properly apply to this case. (§ 366.26, subdivision (c)(1)(B)(i); *Autumn H., supra,* 27 Cal.App.4th 567, 575.) He argues that insufficient evidence supports the court's decision, in light of the strength of the bond he and the child had maintained.

The preference for adoption will not apply if termination of parental rights would be detrimental to the child because the parent has "maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§366.26, subd. (c)(1)(B)(i); *In re Zachary G.* (1999) 77 Cal.App.4th 799, 809.) The juvenile court considers the issue on a case-by-case basis, taking into account the many variables that can affect the parent-child relationship. (*Autumn H., supra,* 27

29

Cal.App.4th. at pp. 575-576; *In re J.C.* (2014) 226 Cal.App.4th 503, 532.) Among these are the child's age, the amount of time the child spent in the parent's care, whether the interactions are positive or negative, and whether the child has particular needs that the parent can satisfy. (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467.)

Based on the respective showings, the court must balance "the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer." (*Autumn H., supra,* 27 Cal.App.4th at p. 575.) On review, the Agency argues for an adapted or hybrid approach for review of this type of decision about the beneficial parental relationship exception. In *In re J.C., supra*, 226 Cal.App.4th 503, the court applied a substantial evidence standard of review to the preliminary factual issues of whether the parent maintained regular visitation and contact with the child and whether the parent proved he or she had a beneficial parental relationship with the child. However, as to the weighing test, in which the juvenile court balances the parent-child relationship against the benefits the child would derive from adoption, the abuse of discretion test may be applied to evaluate this, a " ' " 'quintessentially discretionary decision.' " ' " (*Id*. at p. 531; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314.)

In reviewing the sufficiency of evidence, the reviewing court makes presumptions in favor of the order, views the evidence in the light most favorable to the Agency, and gives the order the benefit of every reasonable inference. (*In re C.F.* (2011) 193 Cal.App.4th 549, 553.) The weight of authority utilizes the substantial evidence test in appeals from decisions about the beneficial parental relationship exception. (*Autumn H.,*

*supra*, 27 Cal.App.4th 567, 575-577.)  We inquire whether the court appropriately found there was no "compelling reason for determining that termination would be detrimental to the child," (§ 366.26, subd. (c)(1)(B)(i)), due to the history of the case (e.g., lack of parent's regular visitation and contact, and lack of benefit to the child from a continued relationship).  (*In re C.F., supra,* 193 Cal.App.4th 549, 553.)  We do not redetermine the credibility of witnesses or reweigh the evidence presented.  (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

## 2.  *Application of Criteria:  Visitation and Contact*

Regular visitation and contact are statutory threshold requirements for a claim that such a beneficial parental relationship has been maintained.  (§ 366.26, subd. (c)(1)(B)(i).)  From the time his visits started to be supervised in October 2013, after Father allowed the child to be in contact with her extremely troubled mother, he had ongoing problems with keeping up visitation.  As outlined above, Father did not want to participate in visitation with the child at a visitation center or a facility like Polinsky.

In January 2014, Father told the social worker that it was very difficult for him to visit because of distance, transportation, and his work schedule.  He was offered visits at another facility or in Oceanside where the child was placed and elsewhere, but he and the Agency each canceled several visits between February and April 2014.  Between May and October 2014, Father was out of touch with the social worker, and then her efforts to set up visitation failed when Father's telephone message system did not work.

Although Father made some efforts to maintain contact and visitation, they were at best inconsistent and only marginally met the statutory requirement for showing any

31

beneficial effect on the relationship. (*In re C.F., supra,* 193 Cal.App.4th 549, 558-559 [parent cannot establish the exception for parent-child beneficial relationship applies, by showing the child derives some small measure of benefit from maintaining parental contact].)

### 3. *Application of Criteria: Benefits of Parental Relationship*

In addition to visitation and contact, these proceedings addressed other issues about substantial or incidental benefit from the father-child relationship. Father testified at the hearing that he called the child daily and she told him about her problems. He testified that she consistently told him she wanted to return home to him. However, the court noted at the hearing there was contradictory evidence in the CASA report and the Adoption Assessment. Those observers had reported that the child was comfortable and happy in her placement and wanted the caregiver to adopt her. The court remarked that Father had not called any witnesses or presented any controverting evidence, and it was difficult to believe the truthfulness of Father's testimony about the child's wishes.

The history of the case included about a year of Father's lost custody of the child during the previous dependency proceeding, when he was unable to handle the needs and demands of Mother and the child when they were together. Subsequently, he was unable to maintain consistent visitation, although the case plan attempted to facilitate his efforts in several ways. The child had developed important ties with the caregiver, calling her Mom and looking to her for security and stability. The child had a relationship with Father, but there was no evidence provided that it was a significant, positive, emotional attachment, of a parental nature. (*Autumn H., supra,* 27 Cal.App.4th at p. 575; see *In re*

32

*Brandon C.* (1999) 71 Cal.App.4th 1530, 1535-1536 [exception applied and legal guardianship appropriate where the parent had consistently visited and maintained a stable parental role].)

The juvenile court had the responsibility of analyzing the evidence about all the circumstances in the child's life, and it had an adequate basis to conclude that she did not have special needs that only Father could satisfy. (*In re Angel B.*, *supra*, 97 Cal.App.4th 454, 467.) Without more of a showing of substantial, overriding benefit to the child if her parental relationship with Father were to be continued, this exception to adoption was not shown to apply here. (*Autumn H., supra,* 27 Cal.App.4th at pp. 575-576.) Substantial evidence supports the juvenile court's findings and orders. (*In re L.Y.L.*, *supra*, 101 Cal.App.4th 942, 947.)

DISPOSITION

The judgment and orders are affirmed.


HUFFMAN, J.

WE CONCUR:


McCONNELL, P. J.


BENKE, J.