IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Parental Rights to | ) | No. 36423-2-III |
| | ) | |
| D.J.S. | ) | PUBLISHED OPINION |
| | ) | |

FEARING, J. — Appellant James Smith is an enrolled member of the federally recognized Oglala Sioux Tribe, formerly known as the Oglala Sioux Tribe of the Pine Ridge Reservation, South Dakota. Smith contends that the Washington State Department of Social and Health Services (DSHS) failed to offer all ordered services and failed to engage in "active efforts," as demanded by the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963, and the Washington State Indian Child Welfare Act (WICWA), chapter 13.38 RCW, before terminating Smith's parental rights to his son, Dennis. We agree with both contentions. We do not reverse the termination based on the failure to offer ordered services since the trial court, based on substantial evidence, found that the services would be futile. We reverse and remand to the trial court to determine if active efforts would be futile.

No. 36423-2-III
*In re Parental Rights to D.J.S.*

FACTS

James Smith (Smith) appeals the termination of his parental rights to his son,

Dennis Smith (Dennis). Smith, who resides in Wenatchee, is a member of the Oglala

Sioux Tribe. The child's mother, Donna Quayle, voluntarily relinquished her rights to

Dennis. We employ pseudonyms for the father, mother, and child.

We take our facts from the parental termination trial. Before the birth of Dennis,

James Smith helped raise another son until the child reached three years of age. That son

is now in his 20s. Smith also assisted in raising his girlfriends' toddlers and a sister's son.

In November 2015, medical personnel found Donna Quayle unconscious after a

seizure. Medics transported Quayle to Central Washington Hospital in Wenatchee, where

hospital staff discovered Quayle to be pregnant. High blood pressure and pre-eclampsia

caused the seizure and a mild stroke. Quayle was airlifted to the University of

Washington Medical Center in Seattle.

On November 13, 2015, University of Washington physicians performed an

emergency caesarean section on Donna Quayle. Doctors delivered Dennis after twenty-

five weeks gestation. Dennis weighed 1 pound, 11.5 ounces at birth. Quayle and Dennis

tested positive for Suboxone and amphetamines at the time of Dennis's birth, but Quayle

denied any drug use.

2

Dennis spent seventy to seventy-five days in the University of Washington hospital before his release to foster parents. During his hospitalization, Dennis required a jet ventilator, oxygen, and a feeding tube. Dennis now suffers from a low white blood cell count, possibly a genetic condition. Dennis cannot see straight even with glasses.

During hospitalization of Dennis, University of Washington staff unsuccessfully attempted to engage James Smith in services and visitation with Dennis. Despite unemployment and despite being afforded free housing, transportation, and meals throughout Dennis's hospital stay, Smith did not visit Dennis on a regular basis or for any extended amount of time. Smith demonstrated angry and violent behavior toward hospital staff and accused staff of choking Dennis. While at the university hospital, Smith repeatedly appeared agitated, displayed jittery movements and rapid speech, and encountered difficulty completing full sentences. In January 2016, hospital security intervened when Smith threatened to kill a nurse. During Dennis's hospital stay, Smith was scheduled to provide a urinalysis sample at Care Plus Medical Center, but he refused.

According to James Smith, he participated, along with Donna Quayle, in a parenting class at the University of Washington hospital. We do not know the nature or length of the class.

3

James Smith claims that DSHS removed Dennis from Dennis's Native American family home at Dennis's birth. The facts show, however, that Dennis never lived at his father's home or with his father's Native American nation.

Following two months of hospitalization, Dennis entered a foster home, where he continued to live at the time of the termination trial. On January 25, 2016, DSHS filed a dependency petition for Dennis. DSHS deemed neither parent capable of caring for Dennis. DSHS concluded that Donna Quayle actively abused illegal drugs.

Because James Smith is a member of the Oglala Sioux Tribe, Smith's son Dennis is eligible for enrollment in the Native American nation. DSHS sent at least three letters to the Oglala Sioux in 2016 and 2017 about James and Dennis Smith, but received no response.

On February 29, 2016, James Smith stipulated to the dependency of Dennis. By order dated March 9, Smith agreed to participate in, and the court directed DSHS to provide a drug and alcohol abuse evaluation and treatment, random urinalyses, a parenting assessment and education, education on Dennis's special needs, a domestic violence evaluation and treatment, a psychological assessment, and housing. The services addressed deficiencies identified by the assigned DSHS social worker, Darin Petersen.

Social worker Darin Petersen identified substance abuse as James Smith's primary deficiency that prevented him from safely parenting Dennis. DSHS's Indian child welfare expert, Brandy West, also identified substance abuse as the primary obstacle to Smith's ability to parent. Smith admitted to methamphetamine use and acknowledged a need for treatment. Petersen recommended a mental health assessment because a mental health illness often accompanies drug use.

Darin Petersen recommended a domestic violence perpetrator's assessment for James Smith because of an order preventing Smith from contact with his mother due to domestic violence. Smith alternatively lived with his mother and couch surfed at friends' residences. We do not know why Smith periodically resided at his mother's dwelling if an order enjoined contact with her.

The dependency court conducted periodic review hearings throughout the dependency. James Smith attended the first dependency review hearing on June 1, 2016. During the review hearing, the court found that DSHS asserted active efforts to engage the parents in services. The dependency court also found that Smith failed to progress in services.

DSHS attempted contacts with relatives of James Smith to assess whether DSHS could place Dennis with a relative. According to Darin Petersen:

MR. BOZARTH [State's counsel]: Mr. Petersen, um at the time after the child was removed, did you make an attempt to address finding family placements for this child?
MR. PETERSEN: We did, yes.
MR. BOZARTH: And who—who did Mr. [Smith] identify?
MR. PETERSEN: Mr. [Smith's] mother Deborah Horner and his sister, I don't recall his sister's name.
MR. BOZARTH: And were attempts made to contact them with regards to any desire to parent the child?
MR. PETERSEN: There was, yes.
MR. BOZARTH: Did either of them ever express a desire to have placement of the child?
MR. PETERSEN: Neither of them ever responded to our inquiries.

1 Report of Proceedings (RP) at 102. We do not know the nature of the DSHS inquiries. We do not know at what address or phone number DSHS contacted the relatives and whether DSHS had accurate information as to the relatives' contact data. DSHS presented no other evidence of efforts to contact James Smith's Native American family.

On September 19, 2016, Wenatchee's Center for Alcohol and Drug Treatment chemical dependency professional Neddy Leppanen evaluated James Smith. Leppanen found Smith severely dependent on methamphetamine and alcohol, and moderately dependent on cannabis. Leppanen recommended Smith undergo a month of intensive inpatient treatment due in part to earlier treatment attempts. Leppanen did not consider Smith's Native American background when evaluating his chemical dependency and did not investigate culturally sensitive treatment options for Smith. Smith began inpatient

6

treatment at the Center for Alcohol and Drug Treatment in Wenatchee on the same day as his evaluation. DSHS does not know the background and experience held by the center in treating Native Americans.

During the first week of intensive inpatient treatment at the Center for Alcohol and Drug Treatment, James Smith's condition improved. Nevertheless, by October 4, Smith exhibited erratic behavior, rapid speech, defiance, and disobedience of center guidelines. Because of the rapid speech, the treatment center ordered two urinalyses, both which tested negative. Based on Smith's erratic behavior, the center caused a mental health provider to conduct an assessment on October 6. Smith agreed to participate in the evaluation, but terminated the evaluation after ten minutes and demanded an attorney.

During his time in treatment, Center for Alcohol and Drug Treatment program staff discovered controlled substances in James Smith's housing unit, and, on October 6, 2016, staff confronted Smith about the contraband. An angry Smith left the center and ended his treatment. Smith believed that center staff endangered his safety by asking him to snitch on other patients. Although DSHS repeatedly informed Smith that his substance abuse prevented his parenting Dennis, Smith refused to participate in further substance abuse treatment.

DSHS social worker Darin Petersen referred James Smith to random urinalyses

services.  Petersen explained to Smith the urinalysis process.  Smith refused random urinalyses.

Social worker Darin Petersen met with James Smith fifteen to twenty times throughout the dependency at the DSHS office.  Early in the dependency, Darin Petersen met monthly with Smith.  When Smith later encountered legal troubles, the frequency of visits waned.  Petersen discussed mental health treatment with Smith during each visit.  Petersen explained to Smith that he did not need a referral for mental health services and that Smith only needed to make an appointment at the provider's office.  The recommended provider, Catholic Family Services, is located in Smith's hometown of Wenatchee and is accessible by public transportation.

During trial, social worker Darin Petersen testified concerning his assistance to James Smith in locating housing:

> MR. BOZARTH: And finally, uh you mentioned something about referrals or directing Mr. [Smith] to housing resources—
> MR. PETERSEN: Mmm hmm.
> MR. BOZARTH: What is—what does that entail?
> MR. PETERSEN: Currently it's called the community housing network.  Uh it's a one—it's basically a one stop shopping phone number that refers you to all the housing, low income housing, shelters in the area.  At that time, uh we would basically write down the names of the local shelters for the individuals or give them a print off of community network services in the area and highlight the shelters that they could call that would fit their current circumstances.

MR. BOZARTH: Is that the resource [DSHS] has available to provide—try to get people into housing in this area?

MR. PETERSEN: It is.

MR. BOZARTH: Does [DSHS] have the ability to . . . subsidize rent for people?

MR. PETERSEN: We can at times, yes.

MR. BOZARTH: Is that something that was appropriate for Mr. [Smith]?

MR. PETERSEN: If he had found a rental, yes, that would have been appropriate.

MR. BOZARTH: But it was—was it up to him to identify the rental first?

MR. PETERSEN: It is, yeah.

MR. BOZARTH: In your opinion, does this process of providing services by [DSHS], does it also take some initiative on the parent's part for that parent to be successful?

MR. PETERSEN: It takes a lot of initiative on [their] part, definitely.

MR. BOZARTH: If a parent is unwilling to cooperate with the service plan, are they likely to become a fit parent?

MR. PETERSEN: Most likely not.

1 RP at 63-64.

After reading this testimony, we wonder if the housing network operated a physical office in addition to a phone number. We do not know if Darin Petersen contacted the housing network on behalf of James Smith and compiled, for Smith, a list of housing providers to call. The record does not show whether Petersen referred Smith for any housing available from Native American nations.

Darin Petersen also assisted James Smith with obtaining a phone. Petersen walked

Smith to the community services office and gave him instructions on how to obtain a

phone. Remarkably, Petersen does not know if Smith actually garnered a phone.

In January 2017, Darin Petersen referred James Smith for a domestic violence

evaluation with a certified domestic violence provider, Mike Magnotti. Smith did not

appear for the evaluation. Petersen referred Smith again to Magnotti in March 2017.

Smith likewise did not appear for the second referral.

DSHS concluded that James Smith would not benefit from parenting classes while

taking methamphetamine. Therefore, DSHS did not refer Smith for parenting education.

DSHS anticipated offering Smith parenting classes through Project Safe Care should he

have achieved sobriety.

Throughout the dependency proceeding, DSHS offered James Smith visitation

with Dennis. The dependency court initially ordered visitation three times per week for

two hours at a time. DSHS gave Smith five referrals for visitation supervisors during the

dependency. Smith visited Dennis five times early in the dependency. Nevertheless,

Smith last visited Dennis in November 2016.

James Smith contends that, while Dennis stayed in the hospital, social worker

Darin Petersen repeatedly denied Smith visitation with his son. The record does not show

that Petersen denied visitation during Dennis's seventy to seventy-five days at the University of Washington hospital. Nevertheless, on some occasions after Dennis's release from the hospital, Dennis's low blood cell count rendered the boy susceptible to illness, so DSHS cancelled scheduled visits.

Dennis suffers from behavioral problems. He can scream, yell, and cry for an hour's time. Dennis attends frequent medical appointments and he needs constant supervision.

After a review hearing on December 7, 2016, the dependency court again found that DSHS asserted active efforts to engage the parents in services. The court also found that James Smith had failed to make progress in services. Because of the lack of visitation, the dependency court, in May 2017, suspended further visits. Thereafter, Smith repeatedly requested visitation with Dennis.

During the pendency of the dependency action, James Smith spent eight to nine months in jail. He never spent much more than one month in jail at a time, however. We do not know the dates of Smith's incarcerations.

DSHS never provided James Smith services related to his Native American heritage. James Smith accuses DSHS of reproaching him for lacking a Native American background, although Smith does not identify the DSHS employee who reproved him.

11

PROCEDURE

On March 24, 2017, DSHS filed a petition to terminate James Smith's parental rights to Dennis. DSHS failed to send notice to the Oglala Sioux Tribe of the termination petition and trial date as required by 25 U.S.C. § 1912(a). The superior court conducted a termination trial in August 2017 and ordered termination of parental rights. On appeal, DSHS conceded it failed to notify the Native American nation of the proceedings and agreed to remand the case for a second trial.

On February 9, 2018, DSHS notified the Oglala Sioux Tribe of the termination petition and an August 21, 2018, termination trial date. DSHS phoned the Native American nation and sent its ICWA child protection services office a complete copy of Dennis's file, which the Native American nation received on July 23, 2018. An Indian child welfare expert employed by DSHS unsuccessfully attempted to communicate with the Oglala Sioux before the second termination trial.

After remand of the termination petition to the dependency court, DSHS social worker Darin Petersen reinstated the offer of services to James Smith. Petersen emphasized to Smith the critical importance of a chemical dependency assessment and treatment. Smith did not respond to Petersen's entreaties other than to appear at the DSHS office the day before trial to request a referral for a chemical dependency

assessment and mental health services. Smith pled guilty to possession of methamphetamine on August 15, 2018.

At the time of the second termination trial in late August 2018, Dennis was two years and nine months old. No one from the Oglala Sioux Tribe appeared at the termination retrial. The trial court observed that James Smith was disoriented as to place and time during the trial.

During the second termination trial, Darin Petersen testified that an active substance abuser cannot parent a child with Dennis's unique medical conditions. According to Petersen, Dennis's behavioral problems need constant supervision. Petersen opined that Smith's constellation of deficiencies rendered him incapable of parenting any child. Petersen testified that Dennis needed a permanent placement immediately.

During the second termination trial, chemical dependency expert Neddy Leppanen testified that, when James Smith terminated inpatient treatment at the Center for Alcohol and Drug Treatment in October 2016, he still needed treatment. Leppanen did not comment on whether she considered Smith's Native American heritage when she performed her chemical dependency evaluation.

DSHS employee Brandy West, an enrolled member in the Citizen Potawatomi Nation, testified as DSHS's designated Indian child welfare expert. West assists DSHS

13

and Native American nations in complying with ICWA and addressing the needs of

Native American families. West lacks knowledge of the Oglala Sioux's child rearing

practices and beliefs.

Brandy West averred that she attempted contact with the Oglala Sioux concerning

Dennis Smith, including calling the Native American nation twice the day before trial, but

no member of the Oglala Sioux expressed interest in the termination proceedings. West

opined that custody of Dennis by James Smith would likely result in serious emotional

and physical harm to Dennis and would not serve Dennis's best interests. West remarked

that Smith never finished any services to correct his parental deficiencies and never

completed substance abuse treatment.

Brandy West testified to whether DSHS engaged in active efforts to provide

services to prevent the dissolution of a Native American family. West declared:

> Um active efforts means that the services aren't just kind of referred
> and told hey, you can go here or there. It's not just enough to identify that
> the person has a substance abuse disorder, but that you sit down with that
> client and you meet them face-to-face, you go over that case plan, you
> develop a plan for how they're going to engage in the services and when
> barriers are talked about that you make efforts to do that. Um in reviewing
> Mr. Petersen's notes and in um FamLink where the notes are at um I saw
> that Mr. Petersen met with Mr. [Smith] on a number of times where he tried
> to engage him in conversation about accessing services, particularly
> chemical dependency. In a situation where he didn't have a phone, um Mr.
> Petersen actually brought him over to the [community services office] and
> provided him the instructions about how to get that phone, which would

14

logically allow him extra access to services. The actual act of walking over
um with the client is an active effort on [DSHS]'s behalf and meeting face-
to-face and going over those barriers are also active efforts to engage
clients.

1 RP at 32-33. West agreed with Darin Petersen's assessment that chemical dependency
imposed the principal impediment to parenting and that Smith would make no gains in his
parenting capability until he achieved sobriety.

Brandy West testified that Dennis would suffer substantial emotional and physical
harm if released to James Smith, because of Smith's ongoing chemical dependency.
West further noted that, when somebody has active, ongoing, and unresolved substance
abuse, that person will likely continue to abuse. West further opined that Smith's
continued use would render Smith incapable of meeting Dennis's basic needs.

During the second trial, Tani Gunn, Dennis's court-appointed special advocate,
testified to Dennis's unique medical needs and noted that his current foster home
placement provides Dennis a safe, stable, and appropriate environment to meet those
needs. According to Gunn, James Smith could not care for Dennis because of Dennis's
medical needs and Smith's continued use of drugs and alcohol. Gunn averred that
Dennis needed permanency "now." 1 RP at 83.

At trial, James Smith testified that he needed no services to help him parent.
Thus, according to Smith, he lacked any obligation to participate in services. Smith

15

described himself as a better parent than anyone else. He boasted that he frequently

cares for children and characterized child care as "easy." 1 RP at 91.

James Smith deems DSHS's demand to engage in services a crime against him

and against Native American law. Smith denied methamphetamine use, but admitted to

his recent conviction of possession of methamphetamine. He also admitted to being

incarcerated for eight or nine months during the dependency. Smith admitted that he

left substance abuse treatment early. Smith claimed that he underwent a mental health

assessment at Catholic Family Services, but Smith did not provide proof of the

assessment.

After the second trial, the superior court terminated James Smith's parental rights

to Dennis. The court entered findings of fact, eight of which James Smith challenges:

> 2.12 <u>Services Offered or Provided</u>. All services ordered pursuant to
> RCW 13.34.130, and RCW 13.34.136, and all necessary services
> reasonably available, capable of correcting the parental deficiencies within
> the foreseeable future, have been expressly and understandably offered or
> provided.
> 2.12.1 The services offered to the father were substance abuse
> services, domestic violence services, mental health services, housing
> services.
> 2.12.2 Parenting education for the father was deferred until he
> achieved sobriety. It is unlikely the father would have benefited from
> parenting education until he achieved sobriety. The father did not achieve
> sobriety and the service would not have corrected any parental deficiency
> within the foreseeable future.
> . . . .

16

2.12.4  Based on the testimony of the qualified Indian expert active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup [of] the Indian family and that these efforts have proved unsuccessful.

. . . .

2.13.7  This young child . . . has been in care since birth and needs permanency now.  The child cannot wait for the father to remedy his parental deficiencies.

2.13.8  The father is currently unfit to parent.

. . . .

2.14  <u>Child's Early Integration Prospects</u>.  Continuation of the parent-child relationship diminishes the child's prospects for early integration into a stable and permanent home.  The child has been out of home since birth.  The child is in a pre-adoptive home and cannot achieve permanency unless parental rights are terminated.  At this point the father has no relationship with the child.

. . . .

2.17  <u>Best Interests of the Child</u>.  Termination of the parent-child relationship is in the best interests of the child.  The father has failed to address his methamphetamine addiction.  The father is no more fit to parent now than at the time the child was removed.  Based on the testimony of the qualified Indian expert, there is evidence beyond a reasonable doubt that continued custody of the child by the father is likely to result in serious emotional or physical damage to the child.

Clerk's Papers (CP) at 172-74.  James Smith also challenges the trial court's conclusion

of law 3.2, which states:

The required elements for termination of parental rights under RCW 13.34.180(1)(a)-(f) have each been established by clear, cogent, and convincing evidence.  That the father is currently unfit to parent has been established by clear, cogent, and convincing evidence.  That active efforts were made to provide remedial services and rehabilitative programs designed to prevent the breakup up the Indian family and that these efforts have proved unsuccessful has been established by clear, cogent, and

convincing evidence. That continued custody of the child by the father is likely to result in serious emotional or physical damage to the child has been established by evidence beyond a reasonable doubt.

CP at 174.

## LAW AND ANALYSIS

*Issue 1: Did sufficient evidence support the trial court's finding that DSHS provided to James Smith all services ordered and all necessary services reasonably available?*

*Answer 1: No. The uncontested evidence established that DSHS failed to provide James Smith one of the services ordered by the dependency court.*

On appeal, James Smith assigns numerous errors to trial court rulings. A principal assignment of error concerns the trial court's finding that DSHS offered him all ordered services.

Chapter 13.34 RCW creates a two-step process for terminating parental rights. First, DSHS must show that it satisfied its statutory obligations under RCW 13.34.180(1). Second, DSHS must show that termination of parental rights would be in the best interests of the child. *In re Welfare of A.B.*, 168 Wn.2d 908, 911-12, 232 P.3d 1104 (2010); RCW 13.34.190. The first step focuses on the adequacy of the parents,

while the second step focuses on the child's best interests. *In re Welfare of A.B.*, 168

Wn.2d at 911.

Pursuant to RCW 13.34.180(1), the first step for termination involves six factors.

These elements are:

> (a) That the child has been found to be a dependent child;
> (b) That the court has entered a dispositional order . . . ;
> (c) That the child has been removed . . . from the custody of the parent for a period of at least six months pursuant to a finding of dependency;
> (d) That the services ordered under RCW 13.34.136 have been expressly and understandably offered or provided and all necessary services, reasonably available, capable of correcting the parental deficiencies within the foreseeable future have been expressly and understandably offered or provided;
> (e) That there is little likelihood that conditions will be remedied so that the child can be returned to the parent in the near future . . . ;
> (f) That continuation of the parent and child relationship clearly diminishes the child's prospects for early integration into a stable and permanent home.

RCW 13.34.180(1). DSHS must prove each element by clear, cogent, and convincing

evidence. RCW 13.34.190(1)(a)(i). DSHS satisfies this evidentiary standard when a

court determines that the ultimate facts are shown to be "'highly probable.'" *In re*

*Parental Rights to K.M.M.*, 186 Wn.2d 466, 478, 379 P.3d 75 (2016) (quoting *In re*

*Welfare of Sego*, 82 Wn.2d 736, 739, 513 P.2d 831 (1973)). James Smith claims that

DSHS failed to fulfill the requirements of RCW 13.34.180(1)(d) and (f).

Even if the trial court determines that DSHS fulfilled the statutory requirements in RCW 13.34.180(1), the court may not terminate parental rights unless doing so furthers the child's best interests. RCW 13.34.190(1)(b). DSHS may prove the best interests element by only a preponderance of the evidence. *In re Welfare of A.B.*, 168 Wn.2d at 911-12 (2010).

We first address the fourth statutory element of parental rights termination found in RCW 13.34.180(1)(d). Under this subsection, DSHS must establish that it provided or offered all ordered services and all necessary services, reasonably available, capable of correcting parental deficiencies in the foreseeable future. DSHS must tailor services to each parent's needs. *In re Dependency of P.D.*, 58 Wn. App. 18, 29-30, 792 P.2d 159 (1990).

James Smith contends that DSHS failed to establish that it provided all ordered and necessary services. In particular, because DSHS delayed Smith's parenting education until he achieved sobriety, DSHS failed to offer an ordered service. Smith also contends that DSHS failed to provide mental health services tailored to his resistance to services and suspicions of the non-Native DSHS. He maintains that DSHS failed to provide substance abuse treatment geared toward Native Americans. Finally, he argues that

DSHS failed to afford him housing, a predicate to mental health and overcoming a chemical dependency.

We agree with James Smith that DSHS failed to afford all ordered services. The initial dependency order and later review orders required DSHS to offer a parenting assessment and classes. DSHS contends that it need not have offered parenting education because Smith never gained sobriety. Nevertheless, the dependency court's orders did not expressly condition parenting classes on sobriety or participation in chemical dependency treatment.

RCW 13.34.180(1)(d) demands that "the services *ordered* under RCW 13.34.136 [be] . . . expressly and understandably offered or provided." (Emphasis added.) Washington decisions repeat the obligation to provide ordered services. The State must provide all court-ordered services to the parent. *In re Dependency of D.A.*, 124 Wn. App. 644, 651, 102 P.3d 847 (2004). The statute expressly requires "both that all services *ordered* have been provided, *and* that all *necessary* services reasonably available have been provided." *In re Dependency of T.L.G.,* 126 Wn. App. 181, 200, 108 P.3d 156 (2005) (citing RCW 13.34.180(1)(d)). The statute does not permit DSHS to choose to withhold an ordered service until the parent completes another service. If DSHS deemed parental classes worthless while James Smith was mired in substance abuse, DSHS

21

should have requested that the dependency court amend the service order to allow withholding of parenting education until Smith attained sobriety.

James Smith also faults DSHS for failing to provide mental health services and chemical dependency treatment tailored to his Native American background. He contends DSHS should have customized mental health services and substance abuse treatment to his background. We reject this argument for several reasons. The dependency court never ordered services attended to Smith's native heritage. DSHS needed to tailor services to Smith's needs, but Smith provided no testimony concerning special needs based on his background. We suspect that some methods of substance abuse treatment may be more beneficial to Native Americans, but Smith did not provide the trial court with evidence of other methods of treatment and their availability and utility for Smith. Nor did Smith testify to any acquaintance with the culture and norms of the Oglala Sioux and a desire to conform to those norms.

DSHS afforded James Smith both mental health treatment and chemical dependency treatment. Smith voluntarily aborted chemical dependency treatment. Smith did not submit to random urinalyses. Days before the termination trial, Smith pled guilty to possession of methamphetamine.

Based on Smith's erratic behavior, the Center for Alcohol and Drug Treatment caused a mental health provider to conduct an assessment. Smith agreed to participate in the evaluation, but terminated the evaluation after ten minutes and demanded an attorney. DSHS also referred James Smith to mental health treatment at Catholic Family Services.

James Smith contends that DSHS failed in its obligation to provide housing. He argues that he needed housing not only for shelter and because the disposition order required housing services, but also because gaining housing plays an integral role in one's recovery from substance abuse. Smith complains that Darin Petersen exerted insufficient effort to assist Smith in procuring housing when Petersen only provided Smith a phone number to call and informed him that DSHS might subsidize housing. In response, DSHS contends it fulfilled its duty to afford housing services by supplying the phone number. DSHS's response assumes that the parent must also exert efforts in order to gain housing.

We find confusing the testimony of Darin Petersen as to the extent that DSHS assisted James Smith in procuring housing. The testimony suggests that Petersen, on behalf of DSHS, gave Smith only a phone number to call and that someone answering the phone would give Smith a list of possible low income housing providers or shelters.

We find no Washington decision that addresses the extent to which DSHS must assist a parent in procuring housing. In finding of fact 2.12.1, the trial court found that

23

DSHS provided sufficient housing services presumably because of supplying James

Smith a phone number to call. Since no testimony or state case law suggests that DSHS

must exert additional efforts, we conclude that sufficient evidence supported the trial

court's finding.

     *Issue 2: Whether substantial evidence supports the trial court's finding that*

*provision of parenting classes would have been fruitless.*

     *Answer 2: Yes.*

     Despite DSHS's violation of the order for offering parenting classes, we affirm the

trial court's holding that the State complied with RCW 13.34.180(1)(d). We rely on the

rule that DSHS need not afford futile services. The futility doctrine allows the trial court

to terminate parental rights if either (1) the services would have been futile when offered

or (2) offering the services would not remedy the parental deficiencies within the child's

foreseeable future. *In re Welfare of Hall*, 99 Wn.2d 842, 850-51, 664 P.2d 1245 (1983).

In other words, when the record establishes that the offer of services would be futile, the

trial court can make a finding that DSHS has offered all reasonable services. *In re*

*Parental Rights to K.M.M.*, 186 Wn.2d at 485 (2016).

     The evidence established that the offer of parenting services concurrent with

substance abuse treatment would have been futile. Darin Petersen and Brandy West

testified that Smith could not benefit from parenting education until he achieved sobriety. Smith would likely have difficulties learning and retaining information from parenting education until sober. Substantial evidence supports the trial court's finding of fact 2.12.2 that Smith likely would not have benefited from education until he gained sobriety. Because of Smith's continued substance abuse, Smith would not have corrected his parental deficiencies within the foreseeable future.

*Issue 3: Does sufficient evidence support the trial court's finding that the State engaged in active efforts, under ICWA and WICWA, to provide services designed to prevent the breakup of a Native American family and that that those efforts proved unsuccessful?*

*Answer 3: No.*

Our examination of whether DSHS provided services to James Smith required under RCW 13.34.180(1)(d) does not end the question of whether DSHS fulfilled all services required before terminating the parental rights of Native American Smith to his son, Dennis. We must also ask whether DSHS complied with law applicable to Native American children, particularly the Indian Child Welfare Act of 1978 (ICWA), 25 U.S.C. §§ 1901-1963, and the Washington State Indian Child Welfare Act (WICWA), chapter 13.38 RCW. Both impose more exacting standards on the termination of parental rights

25

to a Native American child.  *In re Adoption of T.A.W.*, 186 Wn.2d 828, 841, 383 P.3d 492 (2016).  James Smith claims DSHS failed to fulfill two identical provisions of the state and federal acts, the laws' active efforts obligation and the serious emotional or physical harm requirement.  We address the active efforts prerequisite first.

The United States Congress enacted ICWA in 1978 because of the disproportionately high rate of forced removal of Native American children from their traditional homes and their Native American cultures.  Before enactment, states forcibly removed as many as 35 percent of all Indian children, mostly from intact American Indian families with extended family networks, and placed them in predominantly non-Indian homes, which had no relation to American Indian cultures.  25 U.S.C. § 1901(4); Troy R. Johnson, *The State and the American Indian: Who Gets the Indian Child?*, 14 WICAZO SA REV. 197, 208 (1999).  The per capita rate of Indian children in foster care was fifteen times higher than the rate for non-Indians.  25 U.S.C. § 1901(4); H.R. REP. NO. 95-1386, at 9 (1978), *reprinted in* 1978 U.S.C.C.A.N. 7530, 7531.  The removal demonstrated lack of understanding by child welfare workers of the role of extended families in tribal culture and threatened tribal survival by removing children at such a high rate.  The process damaged the emotional lives of Native American children, who lost touch with their people and culture.  RED POWER: THE AMERICAN INDIANS' FIGHT FOR FREEDOM 124

(Alvin M. Josephy Jr. et al. eds., 2d ed. 1999). Congress deemed the interests of tribal stability as important as the best interests of the child. RED POWER, *supra*, at 124. Congress also concluded that the best interests of Native American children did not necessarily echo the best interests of non-Native American children, since the former traditionally enjoy larger extended families and tribal relationships in their culture. B.J. JONES, MARK TILDEN & KELLY GAINES-STONER, THE INDIAN CHILD WELFARE ACT HANDBOOK: A LEGAL GUIDE TO THE CUSTODY AND ADOPTION OF NATIVE AMERICAN CHILDREN 12-13 (2d ed. 2008).

ICWA applies to child custody proceedings, which include actions to terminate parental rights. 25 U.S.C. § 1903(1)(ii). Among other requirements, ICWA mandates that the Native American nation, or the United States Department of the Interior's Bureau of Indian Affairs, be notified of pending child dependency proceedings; and it grants the child's Native American nation the right to intervene in state court proceedings. 25 U.S.C. §§ 1911(c), 1912(a).

After adoption by the United States Congress of ICWA, the Washington State Legislature passed its own version of the act. Both the federal act and state act overlap in their provisions. Washington courts interpret the acts "as analogous and conterminous unless one provides greater protection, in which case the more protective act will supplant

the less protective act." *In re Adoption of T.A.W.*, 186 Wn.2d 828, 844 (2016); *see also*

25 U.S.C. § 1921.

A critical section of ICWA declares:

> Any party seeking to effect a . . . termination of parental rights to an Indian child under State law shall satisfy the court that *active efforts* have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

25 U.S.C. § 1912(d) (emphasis added). A similar provision of WICWA reads:

> A party seeking to effect an involuntary foster care placement of or the involuntary termination of parental rights to an Indian child shall satisfy the court that *active efforts* have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful.

RCW 13.38.130(1) (emphasis added).

Neither 25 U.S.C. § 1912(d) nor RCW 13.38.130(1) identify the level of proof

needed to show active efforts. State courts split as to the burden of proof imposed on the

State to establish the exertion of active efforts under 25 U.S.C. § 1912(d). Some courts,

while relying on the provisions of 25 U.S.C. § 1912(f) that demand the State show harm

to the child beyond a reasonable doubt, hold that the State must also show active efforts

beyond a reasonable doubt. *In re Matter of K.L.*, 2019 MT 256, ¶28, 397 Mont. 446,

451 P.3d 518 (2019); *In re Interest of J.L.C.*, 582 S.W.3d 421, 433 (Tex. Ct. App. 2018);

28

*In re Welfare of M.S.S.*, 465 N.W.2d 412, 417-18 (Minn. Ct. App. 1991); *People in re*

*Interest of S.R.*, 323 N.W.2d 885, 887 (S.D. 1982). Other courts impose a clear, cogent,

and convincing evidence burden of proof. *In re Child of Radience K.*, 2019 ME 73, ¶23,

208 A.3d 380, 389 (Maine 2019); *In re Beers*, 325 Mich. App. 653, 661 n.3, 680, 926

N.W.2d 832 (2018); *In re A.C.*, 239 Cal. App. 4th 641, 651, 191 Cal. Rptr. 3d 701 (2015);

*State, ex rel. Children, Youth & Families Department v. Yodell B.*, 2016-NMCA-029,

¶16, 367 P.3d 881, 885 (N.M. Ct. App. 2015); *In re Doe*, 157 Idaho 920, 342 P.3d 632,

636 (2015); *People ex rel. C.Z.*, 262 P.3d 895, 904-05 (Colo. App. 2010). Alaska, which

leads the nation in interpreting ICWA, initially imposed a preponderance of the evidence

standard. *K.N. v. State*, 856 P.2d 468, 476 (Alaska 1993). Alaska has now adopted the

clear, cogent, and convincing evidence burden. *Bob S. v. State*, 400 P.3d 99, 106 (Alaska

2017).

Our sister division in *In re Dependency of A.M.*, 106 Wn. App. 123, 134-35,

22 P.3d 828 (2001), adopted the clear, cogent, and convincing evidence standard as best

reflective of the standards for the provision of services. The standard correlates to the

provision of services under RCW 13.34.180(1)(d). We agree and also adopt this burden

of proof.

The federal statute does not define "active efforts." Nevertheless, in 2016, the

Bureau of Indian Affairs issued guidance, with legislative rule 25 C.F.R. § 23.2, in

interpreting the term. The rule notes that "active efforts" means

> affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family. [The efforts] must involve assisting the parent . . . through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan.

25 C.F.R. § 23.2. The rule also provides eleven examples of "active efforts," which

include:

> (1) Conducting a comprehensive assessment of the circumstances of the Indian child's family, with a focus on safe reunification as the most desirable goal;
> (2) Identifying appropriate services and helping the parents to overcome barriers, including actively assisting the parents in obtaining such services;
> (3) Identifying, notifying, and inviting representatives of the Indian child's Tribe to participate in providing support and services to the Indian child's family and in family team meetings, permanency planning, and resolution of placement issues;
> (4) Conducting or causing to be conducted a diligent search for the Indian child's extended family members, and contacting and consulting with extended family members to provide family structure and support for the Indian child and the Indian child's parents;
> (5) Offering and employing all available and culturally appropriate family preservation strategies and facilitating the use of remedial and rehabilitative services provided by the child's Tribe;
> (6) Taking steps to keep siblings together whenever possible;
> (7) Supporting regular visits with parents or Indian custodians in the most natural setting possible as well as trial home visits of the Indian child during any period of removal, consistent with the need to ensure the health, safety, and welfare of the child;

(8) Identifying community resources including housing, financial, transportation, mental health, substance abuse, and peer support services and actively assisting the Indian child's parents or, when appropriate, the child's family, in utilizing and accessing those resources;

(9) Monitoring progress and participation in services;

(10) Considering alternative ways to address the needs of the Indian child's parents and, where appropriate, the family, if the optimum services do not exist or are not available;

(11) Providing post-reunification services and monitoring.

25 C.F.R. § 23.2. Under federal law, DSHS must engage in active efforts "tailored to the facts and circumstances of the case." 25 C.F.R. § 23.2.

WICWA, unlike ICWA, defines "active efforts." Under the state definition, DSHS must

make timely and diligent efforts to provide or procure such services, including engaging the parent or parents or Indian custodian in reasonably available and culturally appropriate preventive, remedial, or rehabilitative services. This shall include those services offered by tribes and Indian organizations whenever possible. At a minimum "active efforts" shall include:

. . . .

In any termination of parental rights proceeding regarding an Indian child under chapter 13.34 RCW in which the department or supervising agency provided services to the parent, parents, or Indian custodian, a showing to the court that the department or supervising agency social workers actively worked with the parent, parents, or Indian custodian to engage them in remedial services and rehabilitation programs ordered by the court or identified in the department or supervising agency's individual service and safety plan beyond simply providing referrals to such services.

RCW 13.38.040(1)(a)(iii).

The State argues that, if it proves fulfillment of the services provision of RCW 13.34.180(1)(d), it also satisfies the "active efforts" requisite of ICWA and WICWA. We agree with the State that *In re Dependency of A.M.*, 106 Wn. App. 123 (2001) stands for this proposition. Division One of this court, in *Dependency of A.M.*, concluded that RCW 13.34.180(1)(d) imposes a more rigid standard than the ICWA rule of active efforts. 106 Wn. App. at 134. The court reasoned that, whereas 25 U.S.C. § 1912(d) only requires evidence that active efforts have been exerted to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful, RCW 13.34.180 requires that all ordered and necessary services, reasonably available, capable of correcting the parental deficiencies in the foreseeable future be offered or provided. *In re Dependency of A.M.*, 106 Wn. App. at 134-35. Division Two of this court in *In re Welfare of L.N.B.-L.*, 157 Wn. App. 215, 249 n.33, 237 P.3d 944 (2010), impliedly agreed that the remedial services requirement of RCW 13.34.180(1)(d) places a more strenuous burden on the State than 25 U.S.C. § 1912(d).

We depart from our sister divisions. RCW 13.34.180(1)(d) uses variant language from WICWA and ICWA. Our statute includes no adjective similar to "active." The statutory subsection demands the provision of services, but imposes no standard as to the

32

amount of exertion when supplying the services. Conceivably, DSHS could comply with RCW 13.34.180(1)(d) by supplying ordered and necessary services solely on the basis of passive efforts.

"Active efforts" implies more than the passive efforts often deemed acceptable under RCW 13.34.180(1)(d). More importantly, the Washington State Supreme Court has observed that ICWA demands a higher burden of proof before the trial court may terminate the relationship between a Native American child and his parent. *In re Adoption of T.A.W.*, 186 Wn.2d 828, 842 (2016). Although this observation from the high court does not expressly state that the active efforts rule demands a higher burden, the implication is present. If active efforts do not mean any exertions beyond that demanded by RCW 13.34.180, the state legislature served no purpose by adopting WICWA. Despite its legal position, the State may impliedly agree that the active efforts standard imposes additional duties on DSHS because in this case the State argues that DSHS performed more efforts for James Smith than simply referring him to services.

Other states have held that ICWA's demand of "active efforts" imposes a higher responsibility than their respective state laws requiring services before termination of parental rights. *In re Matter of K.L.*, 2019 MT 256 at ¶¶ 24, 28 (Montana 2019); *In re Beers*, 325 Mich. App. 653, 658-59 (2018); *State in Interest of P.F.*, 2017 UT App. 159,

33

¶32, 405 P.3d 755 (Utah Ct. App. 2017); *In re A.C.*, 239 Cal. App. 4th 641, 656 (2015);

*State, ex rel. Children, Youth & Families Department v. Yodell B.*, 2016-NMCA-029 at

¶¶ 17-20 (N.M. Ct. App. 2015); *In re Doe*, 342 P.3d 632, 637 (Idaho 2015); *In re E.G.M.*,

230 N.C. App. 196, 209-11, 750 S.E.2d 857 (2013); *People ex rel. P.S.E.*, 2012 SD 49,

¶16, 816 N.W.2d 110, 115 (S.D. 2012); *People ex rel. C.Z.*, 262 P.3d 895, 906 (Colo.

App. 2010). Active efforts require that the caseworker take a more proactive approach

with clients and actively support the client in complying with the service plan rather than

requiring the service plan be performed by the client alone. *In re JL*, 483 Mich. 300, 321-

22, 770 N.W.2d 853 (2009). "Active efforts" require affirmative, as opposed to passive

efforts, and "active efforts" require more than the standard "reasonable efforts." *In re

Beers*, 325 Mich. App. 653, 680 (2018). As opposed to passive efforts, such as simply

developing a plan for the parent to follow, active efforts require that a caseworker

actually help the parent develop the skills required to keep custody of the children. *In re

Doe*, 342 P.3d at 637 (Idaho 2015).

One court mentioned that active efforts requires more than pointing the parent in

the right direction. Active efforts requires leading the horse to water. *State, ex rel.

Children, Youth & Families Department v. Yodell B.*, 2016-NMCA-029 at ¶17 (N.M. Ct.

App. 2015). An ICWA expert went further and characterized active efforts as leading a

horse to water and then making it drink, even by pushing its head into the water. *State in Interest of P.F.*, 2017 UT App. 159 at ¶14 (Utah Ct. App. 2017).

The court adjudges each ICWA case in accordance with the circumstances of the case. *Bill S. v. Department of Health & Social Services*, 436 P.3d 976, 981 (Alaska 2019); *In re A.C.*, 239 Cal. App. 4th at 657 (2015). When determining whether the State made active but unsuccessful efforts, courts may look to the State's involvement in its entirety. *Bob S. v. State*, 400 P.3d at 107 (Alaska 2017). The State need not exert ideal efforts, but the court should decide if the State crossed the threshold between passive and active efforts. *Bob S. v. State*, 400 P.3d at 107. We will later address whether the futile efforts rule applies to ICWA cases. For purposes of determining whether the State engaged in active efforts, the court should weigh a parent's demonstrated lack of willingness to participate in treatment. *Bob S. v. State*, 400 P.3d at 107.

Other states have provided some flesh to the bone of "active efforts." The foster care manual for Michigan's Department of Human Services references examples of active efforts as including taking parents to initial appointments and assisting with the intake process, transporting the parent, assisting with completing applications, and providing phone availability. *In re JL*, 483 Mich. at 321-22 (2009). The state agency must develop and implement a family reunification plan. *In re A.C.*, 239 Cal. App. 4th at 657 (2015).

The agency must maintain reasonable contact with the parent during the service plan. *In re A.C.*, 239 Cal. App. 4th at 657.

"Active efforts" requires more than a referral to a service. *In re Beers*, 325 Mich. App. 653, 680 (2018). The client should not be required to develop his or her own resources toward bringing the plan to fruition. *Bill S. v. Department of Health & Social Services*, 436 P.3d 976, 981 (Alaska 2019). The State's efforts are passive when it requires the parent to perform ordered tasks on his own or with his own resources. *Denny M. v. State, Department of Health & Social Services*, 365 P.3d 345, 350 (Alaska 2016). Active efforts required by ICWA entail timely and affirmative steps to remedy problems that might lead to severance of the parent-child relationship. *In re K.B.*, 173 Cal. App. 4th 1275, 1288, 93 Cal. Rptr. 3d 751 (2009). ICWA requires when a parent fails to engage satisfactorily with a caseworker, the caseworker still must try to engage the parent. *In re Matter of K.L.*, 2019 MT 256 at ¶37 (Montana 2019). The active efforts standard requires that some of the efforts should be culturally relevant. *People ex rel. C.Z.*, 262 P.3d at 906 (Colo. App. 2010).

In *Bill S. v. Department of Health & Social Services*, 436 P.3d at 980 (Alaska 2019), the State flew each parent over the Alaskan tundra to visit the children. In *Denny M. v. State, Department of Health & Social Services*, 365 P.3d at 350 (Alaska 2016), the

State paid for cab vouchers to all referred services and visitation because of Denny's inability to navigate the bus system. In *In re A.C.*, 239 Cal. App. 4th 641, 657 (2015), the California agency provided the father transportation tokens to visit the child. In *In re Child of Radience K.*, 2019 ME 73 at ¶27, 208 A.3d at 391 (Maine 2019), the State helped to provide the mother with transportation to attend the services provided to her, and assisted the father in securing a counselor willing to provide services at the jail. In *In Matter of A.L.D.*, 2018 MT 112, ¶6, 391 Mont. 273, 417 P.3d 342 (2018), the State offered to make the appointments for the Native American parent for chemical dependency testing. In *People ex rel. C.Z.*, 262 P.3d 895, 906 (Colo. App. 2010), the State offered to assist the parent in applying for housing. In *Jude M. v. State*, 394 P.3d 543, 556 (Alaska 2017), the State arranged for telephonic visits between the child and the incarcerated parent.

In *In re Welfare of L.N.B.-L.*, 157 Wn. App. 215 (2010), DSHS assisted the parents with obtaining housing at an apartment complex and helped them pay the first month's rent. DSHS also provided skills training, a public health nurse, and transportation.

In *State, ex rel. Children, Youth & Families Department v. Yodell B.*, 2016-NMCA-029 at ¶¶ 21-29 (N.M. Ct. App. 2015), the New Mexico Court of Appeals held that the State failed to engage in active efforts. The State took the affirmative steps of

meeting with the father to create a treatment plan and referring the father to a parenting class. Nevertheless, the State did little else to assist the father in implementing the treatment plan. The State took a passive role by shouldering the father with the burden of not only independently locating and obtaining services, but also ensuring the service providers were communicating with the State about his progress. The State argued that its efforts were reasonable and active, given the father's failure to maintain contact with the State, to meaningfully engage in his treatment plan, and to establish a relationship with the child. Nevertheless, a parent's failure to engage in or complete a treatment program did not excuse an initial failure by the State to make active efforts.

In *In re Welfare of A.L.C.*, 8 Wn. App. 2d 864, 439 P.3d 694 (2019), Division Two of this court reversed the trial court's ruling that DSHS engaged in active efforts. DSHS had provided a referral for the parent for an ordered domestic violence assessment, but did nothing further to assist the parent in obtaining the assessment. ICWA requires more than referrals. DSHS recognized that the parent's lack of housing contributed to the need for the dependency. Nevertheless, DSHS did not assist the parent in identifying housing resources, much less assist the parent with utilizing and accessing the resources.

James Smith argues that DSHS failed to comply with the active efforts prerequisite in the following manners:

1. DSHS failed to assign anyone with Native American background or understanding to assist him.

2. DSHS failed to provide a Native American mental health counselor.

3. DSHS took no steps to soften James Smith's belief, based on his Native American background, that the State had no right to intervene, and DSHS exerted no effort to minimize Smith's resistance to assistance.

4. DSHS did not actively seek housing for James Smith.

5. DSHS sent James Smith to a generic chemical dependency treatment provider rather than one geared toward Native Americans.

We observe that DSHS, in 2016 and 2017, notified the Oglala Sioux Tribe three times total of the pending dependency proceedings involving James Smith and his son. The Native American nation did not respond. In a Nebraska case, the Oglala Sioux participated in a child dependency action. *In re Interest of Mercedes L.*, 26 Neb. App. 737, 923 N.W.2d 751 (2019). The Oglala Sioux's land in South Dakota borders Nebraska. Perhaps the geographic distance made a difference in Dennis Smith's case.

After the first termination trial, DSHS notified the Oglala Sioux Tribe of the pending termination proceeding. DSHS sent James Smith's records to the Native

39

American nation, presumably at the request of the Oglala Sioux. Nevertheless, despite calls from the DSHS Indian child welfare expert, the Oglala Sioux never intervened or showed interest in the proceeding.

We read from the law an overarching requirement in ICWA and WICWA that DSHS cooperate with a Native American child's and parent's Native American nation in attempting to arrange for culturally acceptable and valuable services in correcting parental deficiencies. We question, though, what additional steps DSHS must exert in providing culturally relevant services when a federally recognized sovereign Native American nation refuses to respond to overtures from DSHS. We know of no obligation that DSHS contact the Bureau of Indian Affairs to inquire if some other Native American nation would assist in identifying or providing culturally appropriate services. But we wonder if DSHS should have at least discussed with its Indian child welfare expert, Brandy West, as to other Native American networks that could have afforded assistance and services for James Smith. Smith never asked for culturally relevant services or identified Native American sources for services, but active efforts implies DSHS initiating an investigation into culturally helpful services regardless of whether the parent remains mute.

We still agree with James Smith that DSHS did not engage in active efforts. DSHS avows that Darin Petersen often met with Smith and reviewed plans with Smith.

Nevertheless, meeting with the parent to discuss services does not constitute active efforts. While Petersen accompanied Smith to an office and provided instructions on how to get a phone, Petersen should have ensured that Smith actually garnered a phone. When assisting Smith in procuring housing, Petersen explained to Smith that the community housing network was a "one stop shopping" resource for all low income housing and shelters in the area. 1 RP at 63. Nevertheless, Petersen should have taken Smith to the network and helped Smith complete any application. Petersen's testimony that Smith needed to learn on his own how to find housing and thereby become independent illustrates DSHS's misunderstanding of active efforts. Petersen provided the address for Catholic Family Services for purposes of Smith gaining mental health counseling. Petersen should have taken Smith to the service center and assisted in procuring counseling. Active efforts means more than just making referrals.

The State highlights that Darin Petersen testified James Smith could access the services ordered because all services were in his community and accessible by public transportation. In turn, according to Petersen, Smith admitted he could gain transportation to the services. Again, the State fails to recognize the high measure of responsibility meted by ICWA. Petersen should have followed up with Smith to ensure he gained transportation. Petersen should have led Smith to the bus and sat him inside.

DSHS boasts that it conducted a diligent search for family members of James Smith, who presumably would be Native Americans. We question the diligence of the search. DSHS provided no details of the extent of the search, other than attempting contact with Smith's sister and mother. We do not even know if DSHS had correct contact information for the relatives.

The trial court found that DSHS engaged in active efforts. According to one Washington decision, the trial court's finding of active efforts is a conclusion of law that we review de novo. *In re Welfare of A.L.C.*, 8 Wn. App. 2d 864, 871 (2019). We deem the Alaska and California approach to findings and conclusions better, however. Whether the State made active efforts as required by ICWA is a mixed question of law and fact. *Bill S. v. Department of Health & Social Services*, 436 P.3d 976, 981 (Alaska 2019); *In re K.B.*, 173 Cal. App. 4th 1275, 1286 (2009). We review the underlying findings for substantial evidence, but review de novo whether those findings satisfy the requirements of ICWA. *Bill S. v. Department of Health & Social Services*, 436 P.3d at 981; *In re K.B.*, 173 Cal. App. 4th at 1286. We conclude that the trial court's underlying findings here as to the steps taken by DSHS do not qualify as active efforts as a matter of law.

ICWA does not require that a Native American expert testify that the State exerted active efforts. *In re K.B.*, 173 Cal. App. 4th at 1287 n.12. Nevertheless, Brandy West,

DSHS's Indian child welfare expert, testified that DSHS performed active efforts. We do not find her testimony helpful. West provided a definition of active efforts that emphasized face to face meetings and referrals to services, not leading James Smith to services and immersing him in the services.

*Issue 4: Whether the futile effort doctrine applies to the failure to exert active efforts under ICWA?*

*Answer 4: Yes.*

The State impliedly contends, when it argues that further efforts and services would not have benefited James Smith, that active efforts would have been futile. Thus, we first address whether a state agency may excuse its failure to exercise active efforts on the basis that the additional efforts would have been futile.

One state high court has ruled that the futile efforts doctrine does not apply to the active efforts measure under ICWA. *In re JL*, 483 Mich. 300, 326-27 (2009). The Michigan court worried that courts would simply avoid applying 25 U.S.C. § 1912(d) by deciding that the additional services would be futile. We reject this reasoning as failing to credit the abilities of trial court judges, and as failing to recognize the role of the appellate courts, in ensuring that trial courts apply the ICWA standard of active efforts.

ICWA is not a statute that provides a parent of an Indian child with perpetual chances for rehabilitation. *In re Dependency of A.M.*, 106 Wn. App. 123, 135 (2001). Therefore, this court has adopted the futile efforts rule for purposes of active efforts under U.S.C. § 1912(d). *In re Dependency of A.M.*, 106 Wn. App. 123, 136. The Washington rule follows the prevailing rule. *Bill S. v. Department of Health & Social Services*, 436 P.3d 976, 983 n.26 (Alaska 2019); *State in Interest of M.D.*, 2016 UT App. 3, ¶6, 366 P.3d 408 (Utah Ct. App. 2016); *In re E.G.M.*, 230 N.C. App. 196, 210 (2013); *People ex rel. C.Z.*, 262 P.3d 895, 905 (Colo. App. 2010); *In re K.B.*, 173 Cal. App. 4th 1275, 1284 (2009). The rule embraces the underlying principle of law that does not require the performance of idle acts. *In re E.G.M.*, 230 N.C. App. at 210.

The State may be excused from active efforts because a parent's evasive or combative conduct rendered provision of services practically impossible. *Bill S. v. Department of Health & Social Services*, 436 P.3d 976, 983 n.26 (Alaska 2019). If the parent has a long history of refusing treatment and continues to refuse treatment, the agency need not keep up active efforts once it is clear the efforts would be futile. *Bill S. v. Department of Health & Social Services*, 436 P.3d at 983 n.26.

In *In re Dependency of A.M.*, 106 Wn. App. 123, 135-37 (2001), this court applied the futility doctrine because of a Native American parent's untimely termination of

detoxification treatment, resumption of a lifestyle of drug use and crime, and voluntary disappearance for a substantial period of time in total disregard for parenting obligations.

*Issue 5: Does the futility doctrine apply in favor of the State of Washington in the termination of James Smith's parental rights?*

*Answer 5: The trial court did not enter any finding as to whether exerting active efforts under ICWA would have prevented termination or would have been futile. Therefore, we remand for further proceedings to address this question.*

When impliedly arguing that active efforts would be futile, the State emphasizes that James Smith denied any methamphetamine use. He aborted treatment at a chemical dependency facility, at which time he also abandoned the facility's attempt to procure mental health counseling for him. Nevertheless, although the trial court found futility in regard to the services ordered under state law, the trial court entered no finding that the additional and active efforts demanded by ICWA would be futile. Therefore, we remand to the trial court to address whether additional efforts would have been worthless. The trial court may also further explore whether DSHS engaged in active efforts.

We deem *In re E.G.M.*, 230 N.C. App. 196 (2013) instructive. North Carolina's Jackson County Department of Social Services sought excusal from any failure to exercise active efforts on the basis that additional measures would have been futile.

Nevertheless, the trial court never entered a finding that active efforts would be futile.

Although the record may have supported a determination that further efforts would be

futile, the trial court needed to make proper factual findings based on the record evidence.

The reviewing court reversed and remanded the termination of parental rights for entry of

an order containing proper findings and conclusions. The appellate court authorized the

trial court, within its sound discretion, to receive additional evidence on the issue.

*Issue 6: Did sufficient evidence support the trial court's finding that continuation*

*of the parent-child relationship clearly diminished Dennis's prospects for early*

*integration into a stable and permanent home?*

*Answer 6: Yes.*

James Smith next argues that DSHS failed to present clear, cogent, and convincing

evidence to satisfy RCW 13.34.180(1)(f). In a related argument, Smith contends the trial

court's finding of fact 2.14 is inadequate to permit meaningful review. In finding of fact

2.14, the trial court found that Dennis would likely be adopted and Dennis could not gain

permanency without termination of Smith's parental rights.

RCW 13.34.180(1)(f) requires DSHS to prove that "continuation of the parent

and child relationship clearly diminishes the child's prospects for early integration into

a stable and permanent home." Termination element (f) measures parental unfitness

by examining whether the parental relationship impedes the child's welfare by diminishing the child's chances of entering into an enduring home. *In re Parental Rights to J.B.*, 197 Wn. App. 430, 438-39, 387 P.3d 1152 (2016). DSHS can satisfy RCW 13.34.180(1)(f) in one of two ways. First, DSHS can prove prospects for a permanent home exist but the parent-child relationship prevents the child from obtaining that placement. *In re Welfare of R.H.*, 176 Wn. App. 419, 428, 309 P.3d 620 (2013). In the alternative, DSHS can prove the parent-child relationship has a damaging and destabilizing effect on the child that would negatively impact the child's integration into any permanent and stable placement. *In re Welfare of R.H.*, 176 Wn. App. at 428.

Strong evidence supports a finding that a continuing relationship between Dennis and James Smith would impede Dennis's opportunity for a permanent and stable home. Apart from Dennis's seventy to seventy-five days at the hospital beginning at birth, Dennis has lived in the same pre-adoptive home his entire life. Dennis's fragile health prevented Smith from sometimes visiting Dennis, but, even during the times of permissible visitation, Smith rarely visited his son. Thus, the two achieved little, if any, bonding. Smith refuses to engage in services.

Dennis needs constant care because of special medical and behavioral needs. Foster parents provide this care for Dennis, and the foster parents will adopt Dennis.

No. 36423-2-III
*In re Parental Rights to D.J.S.*

*Issue 7: Whether substantial evidence supports the trial court's finding that termination of James Smith's parental rights is in Dennis's best interest?*

*Answer 7: Yes.*

In addition to finding the six elements of RCW 13.34.180(1) by clear, cogent, and convincing evidence, in order to terminate parental rights, the trial court must also find by a preponderance of the evidence that termination serves the child's best interests. RCW 13.34.190(1)(b). This inquiry is fact specific. *In re Dependency of A.M.*, 106 Wn. App. 123, 131 (2001).

James Smith contends that DSHS failed to present and the trial court failed to consider, Dennis's Native American heritage when it found termination to further the child's best interests. To support his argument, Smith only cites an amicus brief filed in *Adoptive Couple v. Baby Girl*, 570 U.S. 637, 133 S. Ct. 2552, 186 L. Ed. 2d 729 (2013). Based on the brief, Smith asserts that Native American children encounter difficulty in adulthood if removed from their Indian families and adopted by non-Native families.

We decline to address James Smith's argument. RAP 10.3(a)(6) directs each party to supply, in its brief, "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." This court does not consider conclusory arguments unsupported by citation to authority. *Joy v.*

48

*Department of Labor & Industries*, 170 Wn. App. 614, 629, 285 P.3d 187 (2012).

Passing treatment of an issue or lack of reasoned argument is insufficient to merit judicial

consideration. *West v. Thurston County*, 168 Wn. App. 162, 187, 275 P.3d 1200 (2012);

*Holland v. City of Tacoma*, 90 Wn. App. 533, 538, 954 P.2d 290 (1998). From these

principles, we extract the rule that, if the relevant area of law presents a test or a list of

factors for review, this reviewing court will not address the appellant's assignment of

error unless the appellant identifies and analyzes the test or factors. Overwhelming

evidence otherwise supported a finding that termination of James Smith's parental rights

furthered Dennis's best interests.

*Issue 8: Whether the State established beyond a reasonable doubt that James*

*Smith's continued custody of Dennis was likely to result in serious emotional or physical*

*damage to Dennis?*

*Answer 8: Yes.*

James Smith also assigns error to the trial court's finding that continued custody of

Dennis by his father would result in serious emotional or physical harm to the child.

ICWA declares:

> No termination of parental rights may be ordered in such proceeding
> in the absence of a determination, supported by evidence beyond a
> reasonable doubt, including testimony of qualified expert witnesses, that the

49

> continued custody of the child by the parent or Indian custodian is likely to
> result in serious emotional or physical damage to the child.

25 U.S.C. § 1912(f). RCW 13.38.130(3) echoes this requirement. The finding of harm must also be supported by the testimony of a qualified expert witness. 25 U.S.C. § 1912(f); RCW 13.38.130(3). Smith claims DSHS's Indian child welfare expert simply parroted the statutory language and, therefore, the court's finding under this element is unsupported by the evidence. We disagree.

We question whether 25 U.S.C. § 1912(f) or RCW 13.38.130(3) apply to James Smith's circumstances. The federal and state statutes refer to "continued custody," which assumes the parent once had custody of the child. As a result, the United States Supreme Court has held that § 1912(f) does not apply in cases when the parent never had custody of the Indian child. *Adoptive Couple v. Baby Girl*, 570 U.S. at 641, 647-48 (2013). Dennis never resided with Smith. We review the trial court's finding regardless.

James Smith compares this case with *In re Dependency of C.R.B.*, 62 Wn. App. 608, 814 P.2d 1197 (1991). There, the mother argued on appeal that the testimony offered against her was insufficient to terminate her parental rights. The court found that the "'evidence'" presented by the mother's caseworker at the termination hearing consisted of legal conclusions "parroting the language of the statutory requirements found in RCW 13.34.180." *In re Dependency of C.R.B.*, 62 Wn. App. at 618. Division One of

this court held that, since the trial court's findings of fact repeated the testimony of the mother's caseworker, which consisted of only legal conclusions, the court's conclusions were not supported by the facts. *In re Dependency of C.R.B.*, 62 Wn. App. at 619.

We distinguish James Smith's appeal from *In re Dependency of C.R.B.* First, *C.R.B.* did not involve an Indian child. Second, the court did not discuss the statutory elements that apply to the case at bar, RCW 13.38.130(3) and 25 U.S.C. § 1912(f). And finally, the evidence presented by the Indian child welfare expert in this case, Brandy West, did not simply consist of legal conclusions.

Brandy West testified that James Smith never completed any services that would correct his parental deficiencies. His substance abuse would create a substantial harm to the child if Smith gained custody. According to West, when somebody has active, ongoing, and unresolved substance abuse, they will continue to abuse. Smith's continued substance abuse would render Smith incapable of meeting Dennis's basic needs.

## CONCLUSION

We reverse the trial court's finding that the State offered James Smith all ordered services, but we affirm the trial court's finding that the provision of additional ordered services would have been futile. We reverse the trial court's finding that the State exerted active efforts to reunify James Smith and Dennis. We remand to the trial court to

No. 36423-2-III
*In re Parental Rights to D.J.S.*

determine whether additional active efforts would have been futile. When rendering this determination, the trial court may, at its discretion, entertain additional evidence. We otherwise affirm the remaining trial court rulings.

_____
Fearing, J.

WE CONCUR:

_____     _____
Siddoway, J.                        Pennell, A.C.J.